[No. A068667. First Dist., Div. Five. Feb. 25, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
SCOTT ALLAN WRIGHT, Defendant and Appellant.

## COUNSEL

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Enid A. Camps, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PETERSON, P. J.**—Appellant Scott Allan Wright was convicted on multiple counts of rape, attempted rape, sexual battery and assault, burglary, and kidnapping involving two victims: a young girl attacked on her way home from a bus stop, and a woman who had just returned to her own home in appellant's neighborhood after work. Appellant primarily contends the trial court erred in finding admissible certain deoxyribonucleic acid (DNA) evidence, which was derived using the polymerase chain reaction (PCR) matching technique, linking appellant to the crimes.

We find no error because we conclude, as did Division Two of the First Appellate District in *People* v. *Morganti* (1996) 43 Cal.App.4th 643, 671 [50 Cal.Rptr.2d 837] (*Morganti*), that the DNA evidence in this case, derived from the PCR matching technique, satisfied the standard for general scientific acceptance and admissibility stated in *People* v. *Kelly* (1976) 17 Cal.3d 24, 30-32 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*) and *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014 [54 App.D.C. 46, 34 A.L.R. 145] (*Frye*). We also conclude the arguable potential problems with DNA evidence derived from the different technique of restrictive fragment length polymorphism (RFLP), which were identified by Division Three of this

district in *People* v. *Barney* (1992) 8 Cal.App.4th 798, 806-807, 814-816 [10 Cal.Rptr.2d 731] (*Barney*), did not apply here. The PCR matching technique, at the very least, has certainly acquired general acceptance in the scientific community.

We also reject appellant's remaining contentions of lack of due process, ineffective assistance of counsel, alleged error in denying a motion for severance, claimed error as to evidentiary rulings, and claimed sentencing error. We, therefore, affirm the judgment of conviction and the sentence.

## I. Facts and Procedural History

In late 1993, appellant moved from Rockford, Illinois to a neighborhood in Suisun City, Solano County, to live with his father. Shortly thereafter, two victims were raped or sexually assaulted nearby.

### A. *Victim Nicole C.*

The first victim was a young girl, Nicole C., who was on her way home from a bus stop on the evening of December 9, 1993, when she was attacked by appellant.

Nicole got off her bus and was walking home when she saw a man, whom she eventually identified as appellant, hiding in some bushes along her way home. She became frightened and ran; but appellant caught up to her, grabbed her by her hair, and shoved her to the ground.

Appellant put the victim in a chokehold, and pulled her a considerable distance to a less public place. Appellant told the victim that he had a knife, and then said, " 'Be quiet and shut up.' " He raped the victim repeatedly, forced her to orally copulate him, and digitally penetrated her. Appellant ejaculated into the victim's vagina. The victim remembered that appellant had a distinctive foul body odor, which she described as "gross and dirty" and as being a mixture of cologne and a "haven't-taken-a-shower-in-a-few-weeks smell." When she was shown a pair of pants previously worn by appellant, she identified the same unpleasant smell.

After appellant left her, the victim ran home and told her father what had happened. The police were called, and the victim was taken to the hospital. The victim was bleeding from her vagina, consistent with a ruptured hymen, and she threw up repeatedly.

The victim's injuries were treated, her blood was drawn, and oral and vaginal swabs were taken. An expert criminalist from Missoula, Montana,

Mr. Streeter, testified that he conducted testing of ABO blood type and secretor status on the samples provided to him which included seminal fluid, and that the samples derived from the attacker matched appellant. About 32 percent of the population carried the same characteristics. In addition, Streeter testified that a shoe print found at the scene of the attack on Ellen P., which we discuss below, matched appellant's shoe.

Nicole C. afterward identified appellant in a live lineup as the rapist who had attacked her, even though he had changed his appearance by growing facial hair, cutting his hair around the ears, and apparently dyeing his hair a different shade of blond. In the photograph taken of appellant for his driver's license, he looked the same as he had when he had raped the victim.

Afterward, the victim suffered from blisters and sores in her vagina and mouth. The victim had contracted the same venereal disease appellant carried.

### B. Victim Ellen P.

Appellant's next reported victim was Ellen P., who had just returned home from work on the evening of December 17, 1993, several days after the nearby attack on Nicole C. Ellen P. lived in the same subdivision as appellant.

The victim opened her back door to let her dogs out. She left the door unlocked because the dogs would soon return and want to come back in. She went back to her kitchen to get some food.

As she opened the refrigerator, she saw a stranger, appellant, coming at her while crouched down. Appellant told the victim not to scream, then pressed his thumbs into her eyes. The victim screamed for her housemate, Norman S., who was upstairs. Appellant told the victim to shut up or he would kill her. Appellant was wearing a distinctive pink sweatshirt.

Appellant took a hard swing at the victim's face, knocking her to the ground. He punched her in the face and kicked her. He straddled her, took off her pants and underwear, undid her blouse, and began fondling her breasts.

Norman S., who had heard a scream, then came downstairs with a knife. Appellant ran away, and the victim called the police. Norman S. chased appellant down the street.

A neighbor who lived across the street, Andrew P., opened his front door and saw Norman S. chasing appellant, who was wearing a pink sweatshirt,

down the street. A volunteer fire captain in Suisun City, Curtis H., was driving his truck nearby and heard a report on the radio about the fleeing attacker. He saw appellant, wearing a pink sweatshirt, run across the street right in front of his truck. He chased appellant down and caught him just as appellant was trying to get onto a motorcycle with a neighbor. The police arrived very soon thereafter and placed appellant under arrest. Ellen P. identified appellant as the person who had attacked her.

### C. *Summary of Proceedings Against Appellant*

Appellant was charged with multiple counts of rape, sexual battery and assault, burglary, and kidnapping. The trial court held a *Kelly-Frye* hearing and found admissible prosecution DNA evidence derived from the PCR matching technique, which we discuss in more detail in the next part of this opinion. The facts summarized above and the DNA evidence were adduced by the prosecution.

Appellant took the stand and denied attacking the victims. He had simply been out late at night walking in his neighborhood wearing an eye-catching pink sweatshirt, when the volunteer fire captain captured him.

An expert in eyewitness identification, Dr. Blinder, also testified for the defense generally about the problems in eyewitness identifications. His testimony, however, began to undermine the defense case in some respects, as when he testified that identification of a person by smell could be "tremendously important in making intimate identifications." He also described a human's sense of smell as "one of the most reliable and fundamental senses."

The jury found appellant guilty of the attacks on both victims, and the trial court sentenced him to 79 years 4 months in state prison.

## II. DISCUSSION

We affirm the judgment of conviction. For the reasons we discuss below, we follow *Morganti, supra,* 43 Cal.App.4th at page 671, and find that the DNA evidence against appellant derived from the PCR matching technique was properly admitted. We also reject appellant's remaining contentions of lack of due process, ineffective assistance of counsel, alleged error in denying a motion for severance, claimed error as to evidentiary rulings, and claimed sentencing error.

### A. *Admissible DNA Evidence Using the PCR Technique*

The trial court properly concluded the DNA evidence in this case, derived from the PCR matching technique, was admissible under the *Kelly-Frye* standard. In reaching this result, we follow the recent decision in

*Morganti, supra,* 43 Cal.App.4th at page 671, as to which our Supreme Court has denied review, with only one justice voting to grant review. Appellant's main *Kelly-Frye* contentions are conclusively rebutted by the *Morganti* decision, as appellant himself seems to recognize.

Appellant also does not provide any arguments specifically directed against the result reached in the *Morganti* decision. Instead, he attempts to distinguish his case as one in which there were certain errors in evidence collection and maintenance. In essence, appellant contends there may have been errors and an asserted lack of proper laboratory or prelaboratory protocols or safeguards in the collection, preservation, and analysis of the DNA evidence in his particular case; he then attempts to portray these particular evidence collection arguments as more general *Kelly-Frye* issues.

We reject these arguments. Normal disputation as to whether the collection of evidence in a particular case was reliable simply does not equate with, nor is it determinative of, the broader *Kelly-Frye* issue of the general admissibility of a novel type of scientific evidence. In addition, appellant's arguments do not undermine *Morganti*'s ruling that such evidence is admissible, and do not undermine confidence in the particular evidence presented here or the jury's verdict in this case.

In order to provide necessary factual background to our discussion, we briefly summarize the DNA evidence in this case and the prior history of legal precedents involving true *Kelly-Frye* issues as to the admissibility of DNA evidence.

### 1. *The Evidence at the Kelly-Frye Hearing*

After the prosecution indicated it would rely on DNA evidence at trial, the court conducted a *Kelly-Frye* hearing to determine the admissibility of this evidence. An eminent physician and scientists testified that DNA evidence using the PCR technique is widely used and generally accepted in the scientific community.

Dr. Stephen Embury, professor of medicine at the University of California, San Francisco and chief of hematology at the San Francisco General Hospital, testified that the PCR method is widely used in medicine and science for research and treatment of disorders, and its results are generally accepted as reliable and scientifically valid.

Dr. Edward Blake, a forensic scientist and serologist, also testified that the PCR technique, and the DQ Alpha and polymarker methods used to conduct

the PCR analysis in this case, are both generally accepted as reliable and valid in the scientific community.

The chief forensic serologist and executive director of the Serologicial Research Institute, Brian Wraxall, testified that he conducted the DNA evidence analysis in this case, analyzing evidence derived from the attack on Nicole C. using the PCR technique and the DQ Alpha and polymarker methods, which are generally accepted and scientifically valid. The trial court also received extensive documentary evidence on this issue.

The trial court ruled the DNA evidence was admissible at the conclusion of the *Kelly-Frye* hearing.

### 2. *The Evidence at Trial*

At trial, Wraxall again testified at length regarding the methods used here to analyze the DNA evidence. His conclusion was that the genetic profile of the attacker of Nicole C. matched that of appellant, and that only about 1 person in every 55,000 in the general population had the same genetic profile.

However, a defense expert witness, Dr. Riley, testified *after* the *Kelly-Frye* hearing that Wraxall's work might be faulty in a number of respects, that contamination and poor laboratory procedures might have skewed the results, and that if Wraxall's work had been submitted by a student, he would not have accepted it. This discrediting of Wraxall's work, however, was directly contrary to the rebuttal testimony of Embury, which was apparently accepted by the jury. Embury testified that the PCR method's results are reliable and scientifically valid. He also testified the methods and analysis used by Wraxall were scientifically valid, and that Wraxall's work was good and yielded reliable results.

### 3. *Relevant Case Law*

The admissibility of DNA evidence derived from the PCR technique used in this case, and that derived from the different RFLP method used in some other cases, has been the subject of some diversity of views in the courts.

### a. *The RFLP Cases*

In *People* v. *Axell* (1991) 235 Cal.App.3d 836, 853-860 [1 Cal.Rptr.2d 411], the Second Appellate District held DNA evidence, derived from the different RFLP method, was admissible under *Kelly-Frye* standards. However, in *Barney, supra,* 8 Cal.App.4th at pages 818-821, Division Three of

the First Appellate District opined that the RFLP method, in 1992, was not yet generally accepted in the scientific community.

Other appellate decisions on the RFLP method have either followed or not followed *Barney,* and our Supreme Court has also been considering this issue for years. (See, e.g., *People* v. *Venegas** (Cal.App.).)

We also note that, regardless of whatever may have been the situation when *Barney* was decided in 1992, today, after years of additional research, the RFLP method is generally accepted in the scientific community as well. (See, e.g., *DNA Fingerprinting Comes of Age* (Nov. 21, 1997) Science, at p. 1407 ["[T]echnological advances in the use of [RFLP's]—comparing short pieces of DNA from a sample with that from an individual—along with more complete data on the frequency of different DNA patterns in different ethnic populations, have made analyses much more precise . . . . [¶] . . . [¶] Harvard population geneticist Daniel Hartl, who argued in the early 1990s that the chances of a random match were too high, agrees that the science is now precise enough to declare a specific match with enough DNA markers."].) Accordingly, despite the contrary indications of *Barney*, DNA evidence using the RFLP method should be admissible in the future as well. In any event, the RFLP cases are not directly relevant here, since it is the PCR method which is before us in this case.

b.  *The PCR Method: The Morganti Case*

In contrast to the uncertainties arguably affecting the cases on the RFLP method, we do thankfully enjoy unanimity in the cases on the PCR method before us in this case, because our high court recently declined to grant review on, or depublish, *Morganti*, which decided that the PCR method was generally accepted as reliable and scientifically valid. (43 Cal.App.4th at p. 671.)[1]

---

*Reporter's Note: Review granted March 16, 1995 (S044870). See 18 Cal.4th 47 for Supreme Court opinion.

[1]The PCR method is superficially similar to the RFLP method in forensic applications, because each method is a valid scientific technique for comparing the genetic structure of a sample and a suspect. However, the RFLP method compares the lengths of strands of DNA from the two sources, while the PCR method amplifies the DNA, and then compares the existence or nonexistence of certain specific genetic markers in the two DNA sources. (Compare *Barney, supra*, 8 Cal.App.4th at pp. 806-809 [RFLP method] with *Morganti, supra*, 43 Cal.App.4th at p. 662 [PCR method].) In both methods, a statistical analysis of the results will normally be created, to determine the probability that an apparent match between the two DNA sources might have resulted from random chance. For instance, in this case the trial testimony was that the DNA sample taken from evidence of the attack on Nicole C. matched that of appellant, and that the chance of such a match occurring between the sample and a randomly selected individual in the general population was only 1 in 55,000.

Only one justice of the Supreme Court voted to conduct a plenary reexamination of *Morganti*'s conclusion that the PCR method is scientifically valid and generally accepted in the scientific community. We, therefore, agree with and follow *Morganti*'s analysis, in the absence of any contrary precedent from our high court.

### 4. *The Trial Court's Ruling Was Proper*

Following *Morganti*, we agree with the trial court's ruling here. The PCR method has obviously acquired general acceptance in the scientific community. It is a valuable method for determining the genetic similarity of individuals, and is an important forensic tool in cases of rape or child abuse such as this one. The PCR method should be used by prosecutors in bringing criminals to justice, and by juries and the courts in determining questions of fact. (See *Morganti, supra,* 43 Cal.App.4th at p. 671.)

Appellant's objections to the use of such evidence in the trial of this case are not truly *Kelly-Frye* issues, and simply go to the weight, not the admissibility, of such evidence. Appellant suggests, based upon the evidence provided by his expert Riley, that samples may have been contaminated or confused, and that laboratory procedures should have been more rigorous or controlled. Although Riley so testified, neither the jury nor we are bound by such evidence, especially in light of the contrary expert testimony of Embury on these same issues. The DNA evidence here, derived from the PCR method, was admissible evidence. (*Morganti, supra,* 43 Cal.App.4th at p. 671.)

Appellant points especially to the fact that Wraxall's genetic analysis showed Nicole C. and her attacker had a very similar genetic profile, and appellant contends this shows Nicole's DNA had possibly contaminated the samples which were thought to derive from the attacker. The prosecution evidence, obviously credited by the jury, showed that appellant and Nicole C. simply shared the same genetic profile as do many, but not all, of the genetic markers tested; and this did not impair the validity of the DNA evidence pointing to appellant.

In addition, this objection and similar ones testified to by Riley were not *Kelly-Frye* issues because Riley did not so testify at the *Kelly-Frye* hearing which was convened to determine the admissibility of this evidence; and in fact, no defense expert testified at the *Kelly-Frye* hearing that this evidence was not scientifically valid and, therefore, inadmissible. Since Riley's testimony was not presented to the trial court at the *Kelly-Frye* hearing, the trial court obviously was unable to consider it in determining whether the DNA

evidence was admissible. Rather, appellant is seeking to create some sort of retroactive *Kelly-Frye* error here, by arguing Riley's testimony at trial should have had retroactive effect in undoing the trial court's ruling as to admissibility at the previous *Kelly-Frye* hearing. This is not a proper basis for urging *Kelly-Frye* error. ■ As our Supreme Court has held, "These arguments misperceive the nature of the *Kelly/Frye* rule. '[T]he *Kelly/Frye* rule tests the fundamental validity of a new scientific methodology, not the degree of professionalism with which it is applied. [Citation.] Careless testing affects the weight of the evidence and not its admissibility, and must be attacked on cross-examination or by other expert testimony.' [Citation.] 'Once the court acts within its discretion and finds the witness qualified, as it did in this case, the weight to be given the testimony is for the jury to decide.' [Citation.]" (*People* v. *Cooper* (1991) 53 Cal.3d 771, 814 [281 Cal.Rptr. 90, 809 P.2d 865].) ■ The objections here simply went to the weight, not the admissibility, of this evidence.

The trial court also properly suggested that there was something strange about convening extensive *Kelly-Frye* hearings to consider the admissibility of DNA evidence, when such resources would be better used in actually trying cases. ■ ■ ■ Our trial courts will no longer need to expend valuable time and resources on repetitive *Kelly-Frye* hearings directed to this issue of the admissibility of DNA evidence derived from the PCR method, as the trial court was forced to do in this case, now that the well-reasoned *Morganti* decision has become final.[2] ■ Issues as to the proper weight to be accorded to such evidence are for the jury, and may not be avoided by attempts to recast such jury issue as *Kelly-Frye* issues. (See *Morganti, supra*, 43 Cal.App.4th at pp. 667-671.)

Appellant also misinterprets certain language from *Barney, supra*, 8 Cal.App.4th at pages 824-825 as a holding that standard issues of evidence collection or preservation should be governed by the *Kelly-Frye* rule. The *Barney* court, however, simply observed that there must be some preliminary showing that "correct scientific procedures" were followed in each particular case (p. 824) and that this showing "will not approach the level of complexity of a full-blown *Kelly-Frye* hearing in which the question of general acceptance is litigated" (p. 825). A sufficient showing was made here to allow the issue to go to the jury.

We also observe that the DNA evidence here was corroborated or confirmed by other overwhelming evidence of appellant's guilt. He was identified by both victims as the assailant in the two attacks, both by sight and

---

[2]"[C]ase-by-case adjudication as to the 'general acceptance' prong of the *Kelly* test is *not* required once the scientific technique in question has been endorsed in a published appellate opinion. ([*Barney*], *supra*, 8 Cal.App.4th at pp. 824-825.)" (*Morganti, supra*, 43 Cal.App.4th at p. 658, italics added.)

smell; he was tied to the crimes by other physical and blood group evidence; and he was caught red-handed and pink-shirted by a passerby immediately after the second attack. His arrival in the area from Illinois coincided with the attacks, his defense in the second attack was so implausible as to be essentially nonexistent, and his attempted alibi defense in the prior similar Nicole C. attack was exploded by his own former employers.[3] Even in the absence of the DNA evidence relating to the attack on Nicole C., it is obvious appellant would have been convicted in any event. Therefore, even if we assumed arguendo that the admission of the PCR-based DNA evidence were somehow erroneous here, the error would have been harmless in light of the overwhelming other evidence of appellant's guilt. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; *Barney, supra*, 8 Cal.App.4th at pp. 825-826.)

### B. *Other Issues*

Appellant also makes a number of other miscellaneous appellate contentions, which we likewise reject.

### 1. *Due Process Claim*

First, appellant claims his due process rights were violated by the admission of the DNA evidence in this case showing only a 1-in-55,000 chance that a person in the general population would have the same genetic structure as the attacker and appellant. Appellant candidly admits in his reply brief that he does not expect us to accept this due process claim which assails the "product rule" method of calculating statistical data, and we do not do so. The product rule is simply a general principle of mathematics and statistics which was applied here to genetic data, in which the probability of another individual having the same genetic characteristics is determined by multiplying the probabilities for each characteristic. The use of such a statistical method does not violate due process any more than the use of multiplication or addition to determine any other fact in dispute at trial would violate due process.

Our high court rejected a similar claim in *People* v. *Pride* (1992) 3 Cal.4th 195, 242 [10 Cal.Rptr.2d 636, 833 P.2d 643], where appellant contended error arose as a result of the admission of statistical evidence derived from semen stains "placing [defendant] within a small group of Blacks (1 to 4

---

[3]Appellant testified he was working on the night Nicole C. was attacked. His former employers, however, testified appellant was not working that night: He terminated one job four days before the attack on Nicole C. and did not start the other until four days after she was attacked.

percent) who could have contributed the semen," which thereby impermissibly "suggested a mathematical probability of guilt that misled the jury and deprived him of a fair trial and the right to be acquitted upon a reasonable doubt." Our high court rejected the claim because such statistical evidence "of the sort which includes the accused within the class of possible donors has long been admitted in California." (*Ibid.*) Similarly, we find no due process violation here as well. In addition, as previously noted, we would find no prejudice in any event, given the overwhelming other evidence of appellant's guilt.

### 2. Claimed Ineffective Assistance of Counsel

█ Next, appellant contends his trial counsel was ineffective at the *Kelly-Frye* hearing, because he did not call an expert such as Riley to testify for the defense at that hearing, although Riley did testify for the defense at trial. We reject this claim because appellant has not demonstrated ineffectiveness by counsel in this respect, nor the required resulting prejudice. (See *People* v. *Cox* (1991) 53 Cal.3d 618, 655-656 [280 Cal.Rptr. 692, 809 P.2d 351].)

It appears trial counsel provided competent assistance, but simply could not overcome the overwhelming evidence against appellant, including an overwhelming showing that the DNA evidence linking him to the crime was scientifically valid and generally acceptable. Although counsel did not call Riley or another expert to testify at the *Kelly-Frye* hearing, competent counsel could properly judge it better as a tactical matter to call Riley only at trial, when he could use Riley's testimony to surprise the prosecution and bewilder the jury, rather than calling him at the *Kelly-Frye* hearing and thereby providing free advance discovery to the prosecution as to his trial testimony. Moreover, there was no prejudice because it is not at all probable that Riley's testimony would have persuaded the trial court to reject the DNA evidence; his testimony primarily went to the weight, not the admissibility, of that evidence. In addition, trial counsel was not prejudicially ineffective in failing to object on due process grounds to the statistical DNA evidence which was in fact admissible, as we explained in the preceding section of this opinion.

### 3. Proper Denial of Severance Motion

█ Next, appellant contends the trial court erred in denying his motion for severance. We reject this claim.

Appellant sought to sever the charges relating to the attack on Nicole C. from the charges relating to Ellen P., but the trial court denied his motion for

severance. This ruling was not unduly prejudicial or an abuse of discretion, because neither set of charges was significantly more serious or likely to inflame the jury than the other, the evidence as to both victims was of the same strength, and none of the charges carried the death penalty. (See *Frank v. Superior Court* (1989) 48 Cal.3d 632, 638-639 [257 Cal.Rptr. 550, 770 P.2d 1119] (*Frank*).)

In addition, the crimes were similar and showed a number of common marks, which made them cross-admissible for purposes of establishing the identity of the perpetrator. In both attacks, which occurred in the same area and within several days of each other in the month of December, a man who was prowling or hiding in bushes attacked, threatened, assaulted, and sexually molested a lone female victim. Appellant suggests some of these features would be common to many or most rape attempts; and he perceives some difference in that Nicole C. was encountered and attacked on the street, while Ellen P. was attacked inside her home. However, the crimes indisputably do show distinctive common marks in that they occurred in the same residential area, close in time, and the descriptions of the perpetrator were similar. It was obvious that the same perpetrator was responsible for both attacks; and therefore, appellant was either innocent of both or guilty of both. In both attacks, the evidence of his guilt was equal—i.e., there was overwhelming evidence of his guilt in both attacks. It is impossible to discern any legitimate need for severance in such circumstances. "[W]e conclude that [appellant] has not made an adequate showing of potential prejudice and that the trial court did not abuse its discretion in denying severance." (*Frank, supra*, 48 Cal.3d at p. 641.)

### 4. *Claimed Abuse of Discretion in Evidentiary Ruling*

Appellant claims the trial court abused its discretion in refusing to allow prosecution expert witness Wraxall to be cross-examined regarding an alleged incident of poor preservation of evidence or evidence tampering, involving another case years ago in which evidence on a towel became contaminated. We are baffled by this claim of error, since in fact the trial court did allow cross-examination on this issue, after defense counsel more fully explained the basis for the relevance of this cross-examination. No error or abuse of discretion appears.

### 5. *Claimed Sentencing Error*

Finally, appellant contends the trial court erred in imposing consecutive sentences for the kidnapping of Nicole C. for the purposes of rape, and the rapes themselves. We find no error, because such sentencing was proper.

(See *People* v. *Hicks* (1993) 6 Cal.4th 784, 796-797 [25 Cal.Rptr.2d 469, 863 P.2d 714] [It was proper to impose consecutive sentences for a rape and for a burglary carried out for the purpose of committing the same rape.].)

III.   DISPOSITION

The judgment of conviction is affirmed.

Haning, J., and Jones, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 20, 1998.