[No. E029887. Fourth Dist., Div. Two. Apr. 2, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCUS LEE HENDERSON, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 3, 5, and 6.

770

772

## Counsel

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GAUT, J.—**

### 1. *Introduction*

Defendant Marcus Lee Henderson appeals from a judgment convicting him of several violent crimes, including murder, attempted murder, and rape against several different victims. On appeal, defendant raises the following claims: insufficient evidence supported his convictions for murder and attempted murder; the trial court erred in admitting scientific evidence; the court erred in instructing the jury with CALJIC No. 17.41.1; and the court erred in sentencing defendant by imposing a parole revocation fine under Penal Code section 1202.45[1] and calculating the custody credits.

In regards to the scientific evidence issue, we conclude that the trial court properly concluded that capillary electrophoresis, the procedure used for analyzing the amplified deoxyribonucleic acid (DNA) fragments in this case, has gained general acceptance within the relevant scientific community. We also conclude that the added complication of analyzing a multiple source DNA sample did not affect the admissibility of the evidence, but, instead, was a consideration for the jury in weighing the evidence and determining the credibility and accuracy of the DNA test results.

As to the other issues, we conclude that, because section 1202.45 became effective after defendant committed the crimes, the trial court erred in imposing the parole revocation fine. We also find the record unclear as to whether the trial court properly calculated defendant's sentencing credit. For these two reasons, we reverse the trial court's judgment and remand for resentencing. In all other respects, we affirm defendant's convictions.

### 2. *Factual and Procedural History*

In the early morning hours of September 29, 1991, defendant and his companions, Wayne Hill, Marlon Junor, and Arthur Gee, left their apartment complex in a gray Thunderbird to rob someone and use the money to buy beer and marijuana. The men arrived at the parking lot of the Whiskey Creek nightclub, where defendant and another man robbed or attempted to rob

---

[1] All further statutory references will be to the Penal Code unless otherwise stated.

Barrett Hanley and Tamara Acosta. When Hanley refused to surrender his wallet, defendant shot him in the chest with a semiautomatic gun.[2]

As the four African-American men continued to drive around, they pulled up alongside Maria D. and Marisa L. Defendant, who was seated on the front passenger side, pointed his gun at the women and forced them to stop their car and get inside the Thunderbird. After stopping once to threaten Marisa with a knife, the men drove to a remote location and parked under an overpass. At that location, one of the men, described as the tall, thin man, placed Marisa on the trunk of the car and raped her and forced her to orally copulate him. The same man later took Marisa a short distance away, placed her on the ground, and then raped her repeatedly.

Meanwhile, the other three men took turns raping Maria in the backseat of the Thunderbird and outside of the car. Each of the three men forced or attempted to force Maria to orally copulate him, at times while another man raped her from behind. All three men ejaculated in Maria.

Afterwards, the men drove the two women back to Maria's car and returned her keys. One of the men threatened Maria as they drove away.

At 4:00 on the same morning, the four men drove around and noticed a woman, Stephanie W., walking along the sidewalk. Defendant, who was sitting on the front passenger side, first called out to Stephanie. Defendant then got out of the car, fired a shot in the air, and threatened to shoot Stephanie if she did not stop walking. Defendant forced her into the backseat of the car. Inside the car, Stephanie began to shake violently. Defendant pulled her out of the car, threw her on the ground, and shot her in the chest.

About an hour later, the gray Thunderbird stopped next to Debra K., who was five months pregnant. Defendant got out of the car and ordered Debra to get in the car. Debra refused and told defendant that she was pregnant. Defendant fired his gun at Debra's abdomen and then shot her twice in the buttocks. As a result of her injuries, Debra had an emergency cesarean section and delivered her son, Joshua. Because of his premature birth, Joshua died several months later.

On July 29, 1998, the San Bernardino County District Attorney filed an information charging defendant with 19 violent crimes, including murder, attempted murder, kidnapping, kidnapping for sexual purposes, forcible rape, forcible rape in concert, forcible oral copulation, and forcible oral

---

[2]On April 27, 1992, defendant pled guilty to the crimes arising out of the Whiskey Creek incident and served an eight-year prison sentence.

copulation in concert. The district attorney also alleged that a principal was armed with a firearm during the commission of each of the offenses. After a lengthy trial, the jury was unable to reach a verdict and the court declared a mistrial.

On March 15, 2000, the district attorney filed a second amended information charging defendant with the 16 violent crimes: murder;[3] two counts of attempted murder;[4] kidnapping;[5] two counts of kidnapping for sexual purposes;[6] five counts of forcible rape;[7] two counts of forcible oral copulation;[8] two counts of forcible rape in concert;[9] and forcible oral copulation in concert.[10] The district attorney also charged defendant with the following firearm enhancements: a principal was armed with a firearm (all counts);[11] defendant personally used a firearm (all counts);[12] and defendant was armed with a firearm (counts 7 to 16).[13]

After another lengthy trial, the jury found defendant guilty of all 16 crimes. The jury found true all but nine of the firearm enhancement allegations. Specifically, the jury was unable to reach a verdict as to nine of the 16 personal-use allegations. The trial court sentenced defendant to a total determinate term of 148 years eight months and an indeterminate term of 26 years to life.

### 3. *Sufficiency of the Evidence**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 4. *DNA Evidence*

■ Defendant claims that the trial court erred in admitting DNA evidence obtained by using the capillary electrophoresis method of analyzing DNA data. Defendant argues that the trial court erred in finding that the use of capillary electrophoresis on a multiple source DNA sample was generally accepted within the relevant scientific community.

---

[3]Section 187, subdivision (a).
[4]Sections 664 and 187, subdivision (a).
[5]Section 207, subdivision (a).
[6]Sections 207, subdivision (a), and 209, subdivision (b)(1).
[7]Section 261, subdivision (a)(2).
[8]Section 288a, subdivision (c).
[9]Section 264.1.
[10]Section 288a, subdivision (d).
[11]Section 12022, subdivision (a)(1).
[12]Section 12022.5, subdivision (a).
[13]Section 12022.3, subdivision (b).
*See footnote, *ante*, page 769.

Maria's sexual assault examination revealed a stain on her left inner thigh. According to the People's expert witness, the sample taken from the stain was consistent with a mixture of fluids from defendant, Junor, and Gee. If the sample consisted of DNA from two or more individuals, defendant was one possible donor. Among African-Americans, the frequency of finding a match for the DNA profiles found in the sample was 1 in 76,000.

Cellmark Diagnostics (Cellmark) performed the DNA analysis on the swab taken from the stain on Maria's left inner thigh. Cellmark used the short tandem repeats (STR) process to amplify the DNA fragments by using the P.E. Biosystems (formerly Perkins-Elmer Corporation) Profiler Plus and Cofiler systems kits. After the amplification process, Cellmark analyzed the DNA fragments by the process of capillary electrophoresis with the ABI Prism 310 Genetic Analyzer (310 genetic analyzer), another product designed and marketed by P.E. Biosystems.

Before addressing defendant's specific argument concerning the use of capillary electrophoresis on the multiple or mixed source DNA sample extracted from the stain on Maria's left inner thigh, we first consider whether capillary electrophoresis has gained general acceptance within the scientific community.

A. *Overview*

In determining the admissibility of evidence derived from a new scientific technique, California courts apply the three-pronged approach approved in *People v. Kelly*.[28] Under this approach, the courts must consider the following: first, that the method is reliable—i.e., has gained general acceptance in the relevant scientific community; second, that the witness is an expert qualified to give an opinion on the subject; and third, that the correct scientific procedures were followed in the particular case.[29]

Before applying this approach, courts must make the threshold determination of whether to conduct a *Kelly* hearing in the first instance. " '*Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law.' "[30] Published opinions may assist in determining whether the technique is new. "[O]nce a trial court has admitted evidence

---

[28]*People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] (hereafter *Kelly*), approving the standard established in *Frye v. United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014; see *People v. Leahy* (1994) 8 Cal.4th 587, 612 [34 Cal.Rptr.2d 663, 882 P.2d 321].

[29]*Kelly, supra*, 17 Cal.3d at page 30; *People v. Venegas* (1998) 18 Cal.4th 47, 76 [74 Cal.Rptr.2d 262, 954 P.2d 525].

[30]*People v. Leahy, supra*, 8 Cal.4th at page 605.

based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community."[31]

■ If the technique is indeed new, courts must first establish general acceptance. "On appeal, the 'general acceptance' finding under prong one of *Kelly* is ' "a mixed question of law and fact subject to limited de novo review." [Citation.] "[W]e review the trial court's determination with deference to any and all supportable findings of "historical" fact or credibility, and then decide as a matter of law, based on those assumptions, whether there has been general acceptance." [Citation.]' [Citation.]"[32]

■ Courts have applied the *Kelly* three-pronged approach to various techniques used in forensic DNA testing. Two different methodologies are widely practiced: restriction fragment length polymorphism (RFLP) and polymerase chain reaction (PCR).[33] "There are three subtypes of PCR testing: DQ-Alpha, which tests a single genetic marker; Polymarker, which tests five genetic markers; and the STR, which tests three or more genetic markers. [Citation.] The RFLP and PCR methodologies, including the PCR subtypes, have acquired general acceptance in the scientific community. [Citations.]"[34]

RFLP ". . . involves a number of steps: (1) *extraction and purification* of the DNA; (2) *fragmentation* by restriction enzymes; (3) *gel electrophoresis* in which a positive electrical charge to the bottom of an agarose gel on which a DNA sample is placed causes the DNA to move through the gel from the negative to the positive charge; (4) *Southern blotting* in which the gel and DNA in it are transferred to a nylon membrane for easier handling; (5) *hybridization* in which the DNA pattern unique to the individual is identified by use of radioactively tagged probes, 'unzipped' DNA segments of a known length and sequence, designed to seek out a predetermined locus in a polymorphic region of the DNA and band with a like segment of DNA; and (6) *autoradiography* in which a film is developed on top of the nylon

[31]*Kelly, supra*, 17 Cal.3d at page 32; see also *People v. Venegas, supra*, 18 Cal.4th at page 76.
[32]*People v. Hill* (2001) 89 Cal.App.4th 48, 57 [107 Cal.Rptr.2d 110] (hereafter *Hill*), quoting *People v. Morganti* (1996) 43 Cal.App.4th 643, 663 [50 Cal.Rptr.2d 837].
[33]*Hill, supra*, 89 Cal.App.4th at page 57.
[34]*Hill, supra*, 89 Cal.App.4th at page 57, citing *People v. Venegas, supra*, 18 Cal.4th at page 79 (RFLP); *People v. Wright* (1998) 62 Cal.App.4th 31, 34 [72 Cal.Rptr.2d 246] (PCR/ Polymarker); *People v. Morganti, supra*, 43 Cal.App.4th at page 666 (PCR/DQ-Alpha); and *People v. Allen* (1999) 72 Cal.App.4th 1093, 1100 [85 Cal.Rptr.2d 655] (hereafter *Allen*) (PCR/STR).

membrane, revealing the location of the DNA by bands on the X-ray film, called an autoradiogram or autorad. Use of a single probe produces two bands on the autorad. Thus, running four different probes at the same time results in eight bands. [¶] The autorads must be interpreted and the bands produced by the migration of DNA in the gel in different lanes examined to ascertain if they match. . . ."[35]

The other method, PCR, which takes small pieces of DNA and copies or amplifies them, is used when the DNA sample is too small or degraded to perform the RFLP method.[36] "PCR forensic analysis involves three steps. First, DNA is extracted from cells in the sample. Second, select regions of the DNA are amplified. Scientists have identified these regions, also referred to as genes or genetic markers, as areas that exhibit great genetic variation among the population. One widely used marker is the DQ-alpha gene. [Citation.] On average, only about 7 percent of the population shares the same DQ-alpha type. [Citation.] Like DQ-alpha, the D1S80 locus is used in PCR testing because it contains several alleles and exhibits great variation. [Citation.] Polymarker analysis, which amplifies several loci simultaneously, has also been validated for use in PCR testing. [Citation.] After amplification, in the third and final step of PCR analysis the amplified gene is 'typed,' through the use of DNA probes, to identify the specific alleles it contains. [Citation.] If the DNA profile thus constructed differs in any way between the suspect and the sample, the suspect is excluded. But if the profiles match, the analyst must next determine how common the profile is in the population."[37]

Both RFLP and PCR, specifically, PCR/STR, methodologies use electrophoresis.[38] There are two types of electrophoresis: polyacrylamide gel electrophoresis and capillary electrophoresis. To conduct gel electrophoresis, " '[A] test sample is placed on a gel medium in an ionized buffer solution. When an electric current is run through the solution, the sample separates and migrates on the medium into characteristic patterns. These are then fixed, dyed, and read visually by the analyst. [Citations.]' "[39] Capillary electrophoresis provides an alternative process, as described in the next part, in which the DNA sample is mixed with different colored dyes and injected

---

[35]*People v. Axell* (1991) 235 Cal.App.3d 836, 846 [1 Cal.Rptr.2d 411].

[36]*People v. Venegas, supra*, 18 Cal.4th at page 58, footnote 5.

[37]*People v. Reeves* (2001) 91 Cal.App.4th 14, 28-29 [109 Cal.Rptr.2d 728], footnote omitted.

[38]See, e.g., *Hill, supra*, 89 Cal.App.4th at page 57 (PCR); *People v. Axell, supra*, 235 Cal.App.3d at page 846 (RFLP).

[39]*People v. Reilly* (1987) 196 Cal.App.3d 1127, 1137 [242 Cal.Rptr. 496].

into a thin capillary in a machine designed to perform the process. When the DNA fragments reach the end of the capillary, a laser is used to trigger a response in the form of light based on the dyes applied to the DNA sample, which is converted automatically by the computer software into different size peaks that appear on a graph.

In *Allen*,[40] the defendant challenged the trial court's finding that PCR/STR was generally accepted in the scientific community. Citing two published decisions from other jurisdictions, the appellate court held that PCR/STR has gained general acceptance.[41] *Allen* and the cases cited by *Allen* rely on expert testimony that STR has been widely used for various purposes, including forensics.[42]

In *Hill*, the court addressed the specific question of whether the Profiler Plus test kit constituted a new scientific technique for performing PCR/STR that required a determination of general acceptance. The court acknowledged that the forensic DNA testing method of PCR/STR has gained general acceptance within the scientific community.[43] The Profiler Plus test kit simply provided a new and improved version of performing the same procedure. Unlike the Promega test kit in *Allen*, which used four loci (polymorphic DNA locations)[44] and eight primers, the Profiler Plus test kit used 10 loci and 20 primers.[45] Although the defendant's expert challenged the general acceptance of the Profiler Plus test kit, the court held that the Profiler Plus test kit did not embrace a new scientific technique.[46] The court also held that as a matter of law each new PCR/STR test kit need not undergo *Kelly* first prong analysis.[47]

Under *Allen* and *Hill*, PCR/STR is generally accepted procedure for DNA testing and every new test kit for performing this procedure does not require a separate determination of general acceptance. The threshold question, however, is whether capillary electrophoresis, is similar to a newly developed test kit, or whether it is a new technique or procedure. We note that, based on the description of the PCR/STR testing performed in the *Hill*

---

[40]*Allen, supra,* 72 Cal.App.4th 1093.
[41]*Allen, supra,* 72 Cal.App.4th at pages 1099-1100, citing *Com. v. Rosier* (1997) 425 Mass. 80 [685 N.E.2d 739] and *State v. Jackson* (1998) 255 Neb. 68 [582 N.W.2d 317].
[42]*Allen, supra,* 72 Cal.App.4th at page 1100.
[43]*Hill, supra,* 89 Cal.App.4th at page 57.
[44]*People v. Venegas, supra,* 18 Cal.4th at page 59.
[45]*Hill, supra,* 89 Cal.App.4th at page 57.
[46]*Hill, supra,* 89 Cal.App.4th at page 60.
[47]*Hill, supra,* 89 Cal.App.4th at page 58.

case,[48] although it appears that the testing process included capillary electrophoresis, the *Hill* case does not specifically mention capillary electrophoresis nor address the precise issue presented here.[49]

 Significantly, *Kelly* first prong analysis is not made gratuitous simply because the new technique or procedure is part of an overall process. *Kelly* may apply not only to the whole, but also the part of the process that is now performed with a new technique.[50]

 Unlike in the *Hill* case, this case does not involve merely a different test kit for performing the same essential procedure. PCR amplification and electrophoresis are two distinct parts of the overall DNA testing process. "Once the amount of DNA is amplified by the PCR process; the analyst proceeds to identify fragments of different sizes by their migration in an electric field. In order to detect variations, analyst use a process known as electrophoresis. During the PCR amplification of the STR fragments, the primers that are used contain fluorescent tags, which become incorporated into the STR fragments during amplification. During electrophoresis, the amplified fragments will pass through a gel and eventually pass through a detection window at the end of the gel. The fragments can be passed through either a flat slab gel or through a small-diameter capillary that contains a gel or liquid polymer."[51]

Electrophoresis or, more accurately, gel electrophoresis, has gained general acceptance within the scientific community. The California Supreme Court suggested that, unless there is evidence to the contrary, the exact methodology of performing electrophoresis does not present a question of admissibility but only a question directed at the weight of the evidence.[52] California Supreme Court cases and other appellate court cases upholding the general scientific principle of electrophoresis, however, do not provide

---

[48]*Hill, supra,* 89 Cal.App.4th at pages 57-58.

[49]See *People v. Alvarez* (2002) 27 Cal.4th 1161, 1176 [119 Cal.Rptr.2d 903, 46 P.3d 372].

[50]*People v. Leahy, supra,* 8 Cal.4th at page 605; see, e.g., *People v. Reeves, supra,* 91 Cal.App.4th at page 31 (finding general acceptance of product rule, final step of PCR analysis); see also *People v. Morganti, supra,* 43 Cal.App.4th at page 659 (considering defendant's challenge, although ultimately rejected based on expert testimony, to agglutination inhibition testing done by questionable slide rotation method as opposed to centrifugation).

[51]*U.S. v. Trala* (D.Del. 2001) 162 F.Supp.2d 336, 342.

[52]*People v. Fierro* (1991) 1 Cal.4th 173, 214 [3 Cal.Rptr.2d 426, 821 P.2d 1302], citing *People v. Cooper* (1991) 53 Cal.3d 771, 812-813 [281 Cal.Rptr. 90, 809 P.2d 865].

independent analysis, but rely implicitly on a few earlier cases.[53] These early cases deal exclusively with some form of gel electrophoresis.[54]

While both electrophoretic techniques achieve the same purpose, capillary electrophoresis is a new technique that has never been found to be generally accepted within the scientific community. Evidence presented by both the defense and prosecution in this case indicates that gel electrophoresis and capillary electrophoresis are two similar, but distinct techniques for analyzing DNA data. As discussed below, the prosecution's expert testified that the new technique of capillary electrophoresis began to appear in published writings in 1993 or 1994, years before the early cases dealing with electrophoresis granted a blanket approval of the general scientific concept. How can there be general acceptance of a new technique before its existence? Either there has been a material change in the prevailing scientific opinion or, more likely, there has been a material change in the prevailing scientific opinion as understood by the legal community.[55]

We hold that capillary electrophoresis is a new scientific technique for analyzing amplified DNA fragments that requires a determination of general acceptance under the first prong of *Kelly*.

## B. *General Acceptance of Capillary Electrophoresis*

Under the first prong of *Kelly*, a reviewing court gives deference to the trial court's factual determinations and then determines as a matter of law whether the new scientific procedure has gained general acceptance.[56] A reviewing court may consider decisions from other jurisdictions as well as scientific literature on the subject.[57]

During the evidentiary hearing, defendant presented the testimony of Marc Taylor, who had a bachelor of science degree in serology. Taylor

[53]See *People v. Hart* (1999) 20 Cal.4th 546, 635 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Fierro, supra,* 1 Cal.4th at page 214; *People v. Cooper, supra,* 53 Cal.3d at page 812; *People v. Coleman* (1988) 46 Cal.3d 749, 778-779, footnote 23 [251 Cal.Rptr. 83, 759 P.2d 1260]; *People v. Axell, supra,* 235 Cal.App.3d at page 858, footnote 9; *People v. Smith* (1989) 215 Cal.App.3d 19, 26-27, footnote 4 [263 Cal.Rptr. 678].

[54]*People v. Brown* (1985) 40 Cal.3d 512, 529 [230 Cal.Rptr. 834, 726 P.2d 516], reversed on other grounds in *California v. Brown* (1987) 479 U.S. 538 [107 S.Ct. 837, 93 L.Ed.2d 934]; *People v. Yorba* (1989) 209 Cal.App.3d 1017, footnote 1 [257 Cal.Rptr. 641]; *People v. Morris* (1988) 199 Cal.App.3d 377, 384 [245 Cal.Rptr. 52]; *People v. Reilly, supra,* 196 Cal.App.3d at page 1137.

[55]See *People v. Venegas, supra,* 18 Cal.4th at page 53 (stating that prior decision controls unless evidence indicates material change in prevailing scientific opinion).

[56]*Hill, supra,* 89 Cal.App.4th at page 57.

[57]*People v. Axell, supra,* 235 Cal.App.3d at page 854.

testified that, in defendant's case, instead of the standard technique of gel electrophoresis to separate the DNA fragments, Cellmark used the alternative procedure of capillary electrophoresis. With this new technology, the DNA fragments are stained with a florescent dye and then put through a machine, such as the 310 genetic analyzer. The 310 genetic analyzer electronically pulls the DNA fragments through a very thin capillary to separate the fragments according to their size. As the DNA fragments exit the capillary, a laser hits the stained fragments, which emit a certain color light that is captured by a camera to produce results in the form of peaks on graphs called electrophorograms.

Taylor testified that this new procedure has not been published or disseminated for public comment within the relevant scientific community. Taylor explained that laboratories experimenting with this new technique have experienced great confusion with interpreting the results. Taylor further explained that, while the Federal Bureau of Investigations (FBI) published a set of criteria for interpreting the results of capillary electrophoresis, different laboratories have not adopted uniform criteria. Taylor added that, although this technique has worked well with single source samples, because this case involved a mixed or multiple source sample, the interpretation of the results becomes more complicated and less reliable. Taylor opined that the use of the capillary electrophoresis has not gained general acceptance in the scientific community, especially when applied to multiple source DNA samples.

During the prosecution's case, the court continued the evidentiary hearing and the prosecution presented its expert witness, Lewis Maddox. Maddox also described the STR amplification and capillary electrophoresis processes. Maddox explained that, in accordance with the FBI's criteria established for its Combined DNA Index System (CODIS) database, the Profiler Plus and the Cofiler systems perform the STR process by amplifying 13 different locations in the DNA. The amplified PCR product is then put through the process of capillary electrophoresis. With capillary electrophoresis, the mixture comprised of the amplified PCR product and the fluorescent dyes is injected into the capillary. As in the gel electrophoresis process, the smaller DNA fragments migrate faster through the mechanism. The 310 genetic analyzer then reads the results as the DNA fragments move through the capillary.

Maddox testified that Cellmark began their validation of the capillary electrophoresis technique in 1998. Their validation studies included the evaluation of the smallest amount of DNA necessary to produce accurate results, the amount of florescent dye to mix with the amplified DNA material

before injecting the mixture into the 310 genetic analyzer to produce the highest peak heights on the electrophorograms, the amount of DNA mixture necessary to inject into the 310 genetic analyzer to produce the highest peak heights, and the percent of stutter (i.e., error or false peaks) at each location. Cellmark also performed a series of experiments with the use of positive controls and standard quality control measures. In particular, Cellmark performed experiments on mixed DNA samples from two sources. After conducting its validation studies, Cellmark concluded that the process produced valid reproducible results. In October of 1999, Cellmark presented a poster display entitled, Validation of the AmpFISTR, Profiler Plus, and Cofiler PCR Amplification Kits Using the ABE Prism 310 Genetic Analyzer, at the Tenth International Symposium of Human Identification in Florida.

Maddox testified that studies on the capillary electrophoresis process began as early as 1993 or 1994. During his testimony, Maddox also referred to a paper entitled *Capillary Electrophoresis STR Analysis: Comparison to Gel-based Systems*, which was published in the Journal of Forensic Science in 1998. According to the paper, capillary electrophoresis and gel electrophoresis produced the same results. Specifically, the use of the florescent labeling or tagging system of capillary electrophoresis began as early as 1993, as evidenced by a paper published in that year in the Journal of BioTechniques with the title *DNA Typing with Flourescently Tagged Short Tandem Repeats: A Sensitive and Accurate Approach to Human Identification*. Maddox also referred to other publications, including an article written by Bruce McCord and Eric Buel, entitled *Capillary Electrophoresis in Forensic Biology*.

According to Maddox, the use of capillary electrophoresis is varied and widespread. The process is used not only in forensics, but also in cancer research, genetics, and other practical applications requiring human identification.

Maddox opined that the technique of capillary electrophoresis is generally accepted within the scientific community. When asked to compare capillary electrophoresis with gel electrophoresis, Maddox explained that capillary electrophoresis is more reliable and produces consistent, reproducible results.

Persuaded by the prosecution's expert witness, the trial court concluded that capillary electrophoresis is generally accepted within the scientific community. The court also concluded that any issues pertaining to the interpretation of the DNA test results for the multiple source DNA sample should be decided by the jury.

As the trial court below, we are persuaded by the prosecution's expert witness. ■ Testimony from even one expert witness may establish general acceptance within the scientific community.[58] ■ Based on his participation in the validation studies conducted at Cellmark, Maddox testified concerning the procedures used to ensure that the mechanism produced consistent results, meaning results that were reproducible when repeated through the same mechanism and results that were analogous to those obtained through gel electrophoresis. Maddox also testified that capillary electrophoresis was widely used in forensic DNA testing. In arriving at his conclusion that capillary electrophoresis was generally accepted, Maddox relied on numerous publications and studies.

Criminalist Daniel Gregonis reviewed Cellmark's DNA test results. Gregonis concluded that the STR methods used by Cellmark in this case were generally accepted within the scientific community.

In the Utah case, *State v. Butterfield*,[59] the court noted that "the scientific literature presented on appeal appears to be unanimous in its approval of the general principle of identifying STRs by capillary electrophoresis."[60] The Utah court listed the following publications: Buel et al., *Capillary Electrophoresis STR Analysis: Comparison to Gel-Based Systems* (1998) 43 J. Forensic Sci. 164, 169; Le et al., *Capillary Electrophoresis: New Technology for DNA Diagnosis* (1998) 30 Pathology 304, 306; Luckey et al., *High Speed DNA Sequencing by Capillary Electrophoresis* (1990) 18 Nucleic Acids Res. 4417, 4417; Kupferschmid et al., *Maine Caucasian Population DNA Database Using Twelve Short Tandem Repeat Loci* (1999) 44 J. Forensic Sci. 392, 392, 394; Crouse et al., *Analysis and Interpretation of Short Tandem Repeat Microvariants and Three-Banded Allele Patterns Using Multiple Allele Detection Systems* (1999) 44 J. Forensic Sci. 87, 87-88; Yamamoto et al., *Allele Distribution at Nine STR Loci—D3S1358, vWA, FGA, TH01, TPOX, CSF1PO, D5S818, D13S317 and D7S820—in the Japanese Population by Multiplex PCR and Capillary Electrophoresis* (1999) 44 J. Forensic Sci. 167, 167; Wallin et al., *TWGDAM Validation of the AmpFISTR Blue PCR Amplification Kit for Forensic Casework Analysis* (1998) 43 J. Forensic Sci. 854, 868; LaFountain et al., *Validation of Capillary Electrophoresis for Analysis of the X-Y Homologous Amelogenin Gene* (1998) 43 J. Forensic Sci. 1188, 1188, 1193.[61]

The Utah court also noted that many forensic laboratories around the country use capillary electrophoresis and, in particular, the 310 genetic

---

[58]*Allen, supra*, 72 Cal.App.4th at page 1099.
[59]*State v. Butterfield* (2001) 2001 Utah 59 [27 P.3d 1133].
[60]*State v. Butterfield, supra*, 27 P.3d at page 1144.
[61]*State v. Butterfield, supra*, 27 P.3d at pages 1144-1145.

analyzer. Among them are the Forensic Science Association, SERI, Reliagene, the California Department of Justice, and Intermountain Forensic Science.[62] Each of these laboratories has "undergone validation studies, proficiency testing, and internal and external audits . . . ." in using the 310 genetic analyzer.[63]

Based on expert testimony, the scientific literature, and the validation studies, the Utah court took judicial notice of the inherent reliability of the use of the instrumentation, namely, the 310 genetic analyzer, in the performance of PCR/STR DNA testing.[64]

Our independent review of the trial testimony, including the description of the validation studies performed at Cellmark and the discussion of the sampling of literature available on the subject, leads to the conclusion that capillary electrophoresis has gained general acceptance in the scientific community. The evidence of additional publications and studies in the Utah case provides further support for our conclusion.[65] It is apparent that, since its introduction to the world of forensic science, capillary electrophoresis and its various permutations have gained not only general acceptance, but also have become the method of choice for DNA testing under certain circumstances.

C. *Multiple Source DNA Sample*

We turn now to defendant's specific claim that the trial court erred in finding that the use of capillary electrophoresis in testing multiple or mixed source DNA samples was generally accepted within the relevant scientific community under the first prong of *Kelly*.

During the trial, criminalist Daniel Gregonis testified that he tested the substance found on Maria's left inner thigh. Because of the small sample size, Gregonis used the PCR, as opposed to the RFLP, method of DNA analysis. Based on the PCR analysis at two DNA locations, namely, DQ-Alpha and D1S80, Gregonis found that the sample contained a mixture of DNA from at least two individuals. If the sample contained only Maria's DNA and one other person's DNA, Gregonis concluded that neither defendant, Gee, nor Junor could have been the potential donor. However, if the sample contained Maria's DNA and a combination of DNA from two or more individuals, then all three men could have been potential donors.

---

[62]*State v. Butterfield, supra*, 27 P.3d at page 1144.

[63]*State v. Butterfield, supra*, 27 P.3d at page 1144.

[64]*State v. Butterfield, supra*, 27 P.3d at page 1144; accord, *State v. Pappas* (2001) 256 Conn. 854, 880 [76 A.2d 1091, 1108].

[65]*People v. Axell, supra*, 235 Cal.App.3d at page 854.

Gregonis testified that the sample more likely contained a mixture of DNA from two or more individuals. The DNA profile found in the sample appears, at best, in one in 21 African-American men.

A Cellmark employee, Kimberly Duncan, also tested the DNA extracted from the substance found on Maria's left inner thigh. Duncan applied the PCR/STR method of amplifying the DNA and the capillary electrophoresis method of analyzing the amplified DNA fragments. Maddox concluded that the sample contained sperm DNA from at least two individuals. In reaching this conclusion, Maddox noted that, while one individual can produce a maximum of two peaks, some DNA locations indicated four peaks. Maddox concluded that defendant could not be excluded as a potential donor. The frequency that the DNA profile would appear in the African-American population was one in 76,000.

Gregonis concluded that Cellmark's results from the capillary electrophoresis technique of DNA testing were consistent with his own results. Gregonis testified that Cellmark's conclusions, including the frequency calculation, were appropriately conservative.

Defendant argues that the prosecution's evidence concerning capillary electrophoresis analysis of the DNA sample extracted from the substance on Maria's left inner thigh was inadmissible because the use of this new technology on mixed DNA samples has not gained general acceptance in the scientific community.

As previously stated, *Kelly* first prong analysis only applies to a new technique or procedure.[66] Although capillary electrophoresis is a new technique for which first prong analysis is appropriate, capillary electrophoresis on a particular type of DNA sample does not constitute a different scientific technique. Rather, it involves a technique, which has gained general acceptance, as applied to a particular set of circumstances. DNA analysis of a mixed sample is more akin to the testing of a degraded or compromised sample.[67] Under such circumstances, the relevant inquiry is not whether the procedure is generally accepted within the scientific community, but whether the approved procedure was followed correctly in this instance. "When, as in DNA testing, the reliability of the technique employed is not readily apparent to lay observation or experience, *Kelly-Frye* requires determination 'whether a laboratory has adopted correct, scientifically accepted procedures' for conducting the test. [Citation.] 'Consideration and

---

[66]See *People v. Leahy, supra,* 8 Cal.4th at page 605.

[67]See *People v. Wright, supra,* 62 Cal.App.4th at pages 41-43; *People v. Axell, supra,* 235 Cal.App.3d 836, 862.

affirmative resolution of these questions constitutes a prerequisite to admissibility under the third prong of *Kelly*.' [Citation.]"[68]

The third prong of *Kelly* is case specific.[69] It requires that the court determine whether the scientifically accepted procedures actually were followed in a particular case.[70] A trial court's *Kelly* third prong determination is entitled to deference and must be upheld unless the record reveals that the court abused its discretion.[71]

▬ In this case, the trial court, after hearing only Taylor's testimony, tentatively found that the procedures used by Cellmark and the evaluation of the DNA test results presented questions for the finder of fact. In its final ruling, the court found that it was for the jury to decide the credibility of the expert's testimony and the results of capillary electrophoresis analysis of the mixed DNA sample. Although the trial court did not make an explicit finding as to whether Cellmark applied the correct procedures in performing capillary electrophoresis analysis of the mixed DNA sample, we affirm the court's implied finding, which was evident in the court's approval of the reliability and general scientific acceptance of the procedures.[72]

Substantial evidence supports the court's implied finding. Maddox testified that Cellmark performed the DNA analysis of the mixed DNA sample obtained from the stain on Maria's left inner thigh using the same standard procedures applied to any DNA sample. In describing these procedures, Maddox testified that Cellmark observes rigid quality control measures. For instance, when Cellmark receives evidence, only one piece of evidence is opened at a time to prevent contamination or cross-contamination with different samples. Another measure to avoid contamination is the use of two separate rooms, one to amplify the DNA sample and one to analyze the amplified DNA by the use of the 310 genetic analyzer.

Maddox testified that mixed samples might involve more complications with stutter. Maddox, however, stated the problems presented by stutter in mixed samples are taken into consideration.

Before the jury, Maddox described the actual procedures performed by a qualified scientist, Kimberly Duncan, in testing the mixed DNA sample for

---

[68]*People v. Roybal* (1998) 19 Cal.4th 481, 505 [79 Cal.Rptr.2d 487, 966 P.2d 521].

[69]*People v. Venegas, supra,* 18 Cal.4th at page 78.

[70]*People v. Venegas, supra,* 18 Cal.4th at page 78.

[71]See *People v. Venegas, supra,* 18 Cal.4th at page 91; *People v. Reeves, supra,* 91 Cal.App.4th at page 47.

[72]See *People v. Venegas, supra,* 18 Cal.4th at page 91; *People v. Reeves, supra,* 91 Cal.App.4th at page 47.

this case. After the extraction and the PCR amplification steps, the amplified DNA, which has been mixed with primers, is placed into the 310 genetic analyzer for analysis. The DNA travels through a very thin tube or capillary. The DNA segments separate by size as the smaller segments traveling faster through the capillary. As the segments pass through a window, the machine reads the primers or fluorescent tags, which reflect different colored lights. The machine records the data as peaks on the electropherogram.

After testing the mixed DNA sample from the stain on Maria's left inner thigh, Maddox noticed numerous different peaks, which indicated that something was unusual. In such instances, Cellmark usually reamplifies the original DNA sample and performs the entire process over to ensure that the controls worked effectively. Maddox testified that there was nothing wrong in the actual testing process; in other words, there was no indication of contamination.

Maddox's testimony provided substantial evidence that Cellmark performed the capillary electrophoresis of the mixed DNA sample in accordance with its standard procedures. The trial court therefore did not abuse its discretion in impliedly finding that Cellmark used the correct scientific procedures in this case.

As the court also found, the ultimate determination as to whether the DNA test results were persuasive or helpful in establishing defendant's guilt was a question for the jury. The question concerned the weight, not admissibility, of the evidence.[73] In this case, the jury heard DNA evidence from Gregonis and Maddox. While some of the evidence pinpointed exactly the individual responsible for certain DNA samples (for example, DNA from the vaginal swab of Marisa matched Hill with the statistical frequency of one in 6 million), other evidence provided less certain results (for example, defendant could not be excluded as one of multiple donors of the mixed DNA sample from the swab of the stain on Maria's inner thigh with a statistical frequency of one in 76,000 people). Lay jurors can easily distinguish and assign weight based on the description of the results obtained from the DNA testing. Thus, the court properly admitted the evidence for the jury's consideration.

In summary, based on the material change in the scientific community as perceived by the law, DNA testing, particularly PCR/STR method of DNA testing, by capillary electrophoresis involves a new technique that required a determination as to whether it was generally accepted within the relevant scientific community under the first prong of *Kelly*. Based on our independent review of the prevailing law and the evidence presented in this case, we

[73]See *People v. Morganti, supra*, 43 Cal.App.4th at page 664, footnote 12.

conclude that capillary electrophoresis has gained general acceptance as a fast and accurate method of forensic DNA testing. We also conclude that the trial court properly admitted the evidence of the capillary electrophoresis testing of the DNA sample obtained from the stain on Maria's left inner thigh.

5., 6.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

7. *Disposition*

We affirm in part and we reverse in part. We remand to the trial court and direct the court to strike the parole revocation fine and recalculate defendant's custody credits. We also direct the trial court to send a copy of defendant's amended abstract of judgment to the Department of Corrections. In all other respects, we affirm defendant's convictions.

Ramirez, P. J., and McKinster, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 11, 2003.

---

*See footnote, *ante*, page 769.