Filed 3/25/22  P. v. Gutierrez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G059846 |
| v. | (Super. Ct. No. 20NF1137) |
| GUILLERMO GUTIERREZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Cassidy, Judge.  Affirmed.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Guillermo Gutierrez of assault with a deadly weapon—a screwdriver (Pen. Code, § 245, subd. (a)(1); count 2).[1] The trial court additionally found true allegations Gutierrez had suffered three prior strike convictions (§§ 667, subds. (d) & (e)(2)(A), 1170.12, subds (b) & (c)(2)(A)), and three prior serious felony convictions (§ 667, subd. (a)(1)).[2]

The court struck two of Gutierrez's strikes and one serious felony prior, and sentenced him to an 18-year prison term, comprising an upper term of four years on the assault, doubled to eight years under the two-strikes law, plus two consecutive five-year terms for the two remaining serious felony priors.

On appeal, Gutierrez makes two claims. First, he contends the trial court prejudicially erred by allowing the introduction of DNA evidence, arguing the prosecution failed to establish requisite foundations for its admissibility under the *Kelly* test.[3] Second, he claims the trial court miscalculated his custody credits, and he is entitled to an additional 13 days of presentence custody credit. We disagree and affirm.

**FACTS**

Eduardo Q. was a semi-transient man who lived in the Anaheim area. He owned a Honda, which he used for transportation and shelter. Eduardo was acquainted with appellant Gutierrez and codefendant Micah Hansen from approximately 2009 to

---

[1]     All statutory references are to the Penal Code unless otherwise indicated.

[2]     The jury acquitted Gutierrez of robbery (§§ 211/212.5, subd. (c); count 3), and the trial court dismissed the carjacking count (§ 215, subd. (a); count 1) at the close of the prosecution's case-in-chief (§ 1118.1).

[3]     *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*).

2

2012.[4] Eduardo lost touch with both men when he moved to Whittier in 2012, but they reconnected in 2020.

On May 12, 2020, Hansen asked Eduardo to hang out, and Eduardo picked him up in the Honda. For the rest of that day, the two drove around the old Anaheim neighborhood, drinking and smoking marijuana, and periodically stopping to purchase more alcohol. They drove to Hansen's garage around midnight, where Eduardo parked in the alley behind the building. Six or seven other people were there, but Eduardo could only identify Hansen and Gutierrez. The group continued drinking and socializing.

At some point, Eduardo was attacked by several people who beat and kicked him. He was also stabbed twice in the neck and once in the upper ribcage; he suffered several defensive lacerations on his hands. Eduardo fled, leaving the Honda behind. About 5:00 a.m. on May 13, he flagged down police, and told them he had been stabbed. Police examined the puncture wounds in Eduardo's neck and had him taken to an emergency room. Officers looked for the Honda, but it was no longer in the alley.

After Eduardo was discharged from the hospital, he went to the police station to report his vehicle stolen; while there, he was interviewed by an investigating detective. Eduardo claimed he was set up by Hansen and Gutierrez. He said Gutierrez was the one who stabbed him with a screwdriver and provided a physical description. On May 19, Eduardo picked Gutierrez out of a photo lineup, and once again identified him as the man who stabbed him.

Meanwhile, about 5:30 p.m. on May 13, police located the Honda and began surveillance of the area. Gutierrez was seen near the car, and Hansen was seen getting in and out of it several times. Police searched the vehicle later that night and

---

[4] Hansen was tried jointly with Gutierrez; the jury acquitted Hansen of all charges.

found a screwdriver and a knife. A crime scene investigator took DNA sample swabs from the steering wheel and gear shifter.

A forensic scientist analyzed the swabs and the weapons found in the Honda and compared results to known DNA samples taken from Gutierrez, Hansen, and Eduardo Q. The swab from the screwdriver handle contained a DNA mixture with one major contributor and two trace contributors. It was at least one trillion times more likely that Gutierrez was the major DNA contributor with two unrelated contributors than that the DNA mixture was from three unknown unrelated individuals; both Eduardo and Hansen were eliminated as possible contributors. A swab of the screwdriver tip revealed a single source male contributor, and it was one trillion times more likely than not to be Gutierrez. The knife handle swab contained a mixture with two main contributors and two trace contributors. It was at least one billion times more likely that Gutierrez was one of the two main contributors; Eduardo and Hansen were again eliminated. As for the steering wheel and gear shifter swabs, it was at least one trillion times more likely that Hansen was the major DNA contributor along with four random unrelated contributors, none of whom were Eduardo or Gutierrez.

At trial, Eduardo retracted his earlier identification of Gutierrez as his assailant, claiming he did not see who stabbed him and he was unsure whether Gutierrez and Hansen were present during the attack. Eduardo admitted he did not want charges to be filed; he acknowledged he was forced to testify pursuant to a subpoena. He explained he was reluctant to name his attackers because he did not want to be labeled as a "snitch."

**DISCUSSION**

I.    *The DNA Evidence*

Gutierrez contends the trial court prejudicially erred in admitting the DNA evidence for two reasons. First, he argues the prosecution's DNA expert "did not testify that her testing method was one of the two techniques that have been recognized in

4

California for DNA testing," i.e., either restriction fragment length polymorphism (RFLP) or polymerase chain reaction (PCR). Second, Gutierrez maintains the prosecution failed to establish that use of "the STRmix software has been generally accepted in the scientific community or that the program incorporates generally accepted scientific methods in its statistical analysis" of DNA evidence. His first claim is a purely factual one; the second refers to the first prong of the *Kelly* test as discussed hereafter.

A.    *Additional Factual Background*

Gabriela Monroe, a forensic scientist employed at the Orange County Crime Laboratory (Crime Lab), was the case manager for the DNA tests and analyses done in this matter. She had six years of experience at the Crime Lab, had tested and analyzed thousands of DNA samples, and had previously testified as a DNA expert several times. She held bachelor's and master's degrees in chemistry and had received 18 months of specialized training in "evidence screening, DNA extraction, quantitation, amplification, DNA typing, and typing interpretation of the DNA evidence." She was a member of the California Association of Criminalists and the American Academy of Forensic Sciences, both of which provide "feedback" from the scientific community as to "trends" in the forensic sciences, both locally and nationwide. She received annual training and education to stay current on scientific practices and procedures in forensic DNA testing, including the STRmix software. Monroe's qualifications as an expert witness were not challenged by the defense.

Monroe testified the Crime Lab was accredited by the American National Standards Institute National Accreditation Board, an indication it was acknowledged for its "distinguished quality of work." The testing procedures used by the Crime Lab were all "generally accepted by the forensic DNA scientific community." No objection was lodged to this testimony.

Monroe testified the Crime Lab's "methods of testing and typing" are "used by a majority of forensic scientists in the field of forensic DNA analysis." A generic

5

foundational objection to this testimony was overruled.  When she was asked whether the "DNA testing procedures that are generally accepted within the forensic DNA scientific community [were] followed for all DNA testing procedures in this case," another non-specific foundational objection was overruled, and Monroe answered they were.

Monroe analyzed the crime scene investigator's swab samples and DNA she found on the screwdriver and knife and compared them to known reference samples taken from Gutierrez, Hansen, and Eduardo.  To do so, the first step was to develop DNA profiles from the crime scene evidence.  DNA was extracted, purified, quantitated, and amplified.  These extractions were then run through an instrument that created genotypic profile peaks at the 24 loci on human DNA "where most people, excluding twins, are shown to be variant."  This 24-loci method is recommended by the FBI and is now standard in the scientific community.

The next step is to interpret the profiles to determine whether there is a mixture of individuals' DNA or a single person source.  The analyst then decides whether the data "is suitable for interpretation."  If so, a second analyst, who is unaware of the first analyst's results, performs a second interpretation.  If the two interpretations are consistent, an analyst does a "deduction or deconvolution," which is the "interpretation part."  Once that is done, "we are then able to compare reference samples to the DNA profiles."

Monroe described how she went through these processes in this case and how matches were made between the DNA profiles obtained from the physical evidence and the known DNA profiles taken from the persons involved.  When asked the "likelihood ratio" of Gutierrez's known DNA to the mixed DNA sample taken from the handle of the screwdriver, assuming there were three contributors to the mixture, Monroe opined that it was "at least one trillion times more likely to observe the DNA sample if [Gutierrez] is the major contributor, along with two random unrelated contributors, than if the DNA mixture was from three unknown, unrelated individuals."  A foundational

6

objection to this question and answer was overruled. Monroe then provided similar conclusions regarding the other comparisons she had made in the case.

B. *Forfeiture*

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless . . . [t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353, subd. (a).) Thus, to properly raise the objections to the DNA evidence he now brings on appeal, Gutierrez was required to make both *timely* and *specific* objections to the introduction of that evidence, and on the same grounds he now raises on appeal. Here, he did neither.

"The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal."' [Citation.] 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.'" (*People v. Partida* (2005) 37 Cal.4th 428, 434 (*Partida*).)

Monroe's name was on the prosecutor's witness list and his trial brief alerted the defense to the fact he intended to introduce evidence related to Gutierrez's DNA. Moreover, both defendants' counsel had a "DNA packet" provided by the prosecutor in discovery. Gutierrez's counsel did not file any motions in limine or proffer any pretrial foundational objections regarding the introduction of the proposed DNA evidence. In fact, codefendant Hansen's counsel made a motion in limine to restrict the

7

DNA evidence as regards anecdotal research done by the Crime Lab on the subject of DNA "transference," and the court granted it. When the court asked if there was anything further, Gutierrez's counsel replied there was not.

Well before Monroe testified, the court specifically inquired of Gutierrez's counsel, "Do you anticipate having any foundational challenge to the DNA evidence?" Counsel replied, "I believe so, your Honor. I'm going to review the cases to see if that has been accepted locally or in California. I just found out about it this morning. I haven't had a chance to review that. [¶] But I don't know if [the prosecutor] has access to the prior testimony of where they accepted it here in Orange County." The prosecutor replied he did not but explained to the court he had notified defense counsel that Monroe told him, "I just want to make sure you guys are aware it's STR mix. It's not new information. That's information that's always been there." The trial court then told Gutierrez's counsel, "All right. *Let me know tomorrow.*" (Italics added.)

The next day, prior to the lunch break, the court again asked counsel, "Are there evidentiary issues we need to deal with before we start up this afternoon?" Gutierrez's counsel replied, "I don't think so, your Honor." Thus, no pre-testimony foundational challenge to the STRmix software evidence was made. It was only in the middle of Monroe's testimony that Gutierrez's counsel proffered objections to questions involving the DNA evidence in general, and STRmix in particular.

The "foundational" objections Gutierrez's counsel made to portions of Monroe's testimony failed to preserve the *Kelly*-based challenges Gutierrez now raises on appeal. Neither defendant made an objection that invoked *Kelly* by name or in substance—despite Hansen's counsel having expressly objected to other, unrelated DNA evidence. There was no request for a pretrial evidentiary hearing under Evidence Code sections 402 or 405 on *Kelly* grounds during the final discussions between the court and counsel on the day the trial began, and no indication that either defense counsel intended to raise a *Kelly* challenge to the prosecutor's DNA evidence. When directly asked by the

8

court about any "evidentiary issues" before Monroe began her testimony, counsel said there were none. We do not construe counsel's generic foundational objections to encompass the very narrow *Kelly*-based contentions Gutierrez makes on appeal regarding STRmix.

We find guidance in *People v. Doolin* (2009) 45 Cal.4th 390. There, the defendant conceded PCR-based DNA testing was reliable but for the first time on appeal took issue with a supplemental test—"dot-intensity analysis"—that was used to help analyze mixed contributor semen samples. The defendant argued on appeal dot-intensity analysis was "a new scientific technique, requiring independent proof of general acceptance." (*Id.* at p. 448) The Supreme Court found that because the defendant did not specifically object to the dot-intensity analysis at trial, he "forfeited his appellate challenge to the evidence," citing Evidence Code section 353. (*Ibid.*)

Counsel's midtrial foundational objections were insufficient to trigger the need for a full-blown *Kelly* hearing which would have entailed a potentially lengthy delay in the trial, when defense counsel had specifically told the trial court there were no evidentiary issues. Any other ruling would render the terms "timely" and "specific" in Evidence Code section 353 meaningless. (See *People v. Lazarus* (2015) 238 Cal.App.4th 734, 780, 786 (*Lazarus*) [defendant sought a prong one *Kelly* hearing but declined to raise a pretrial prong three claim when offered by trial court; prong three issue forfeited on appeal].)

The foundational objections Gutierrez's counsel made during trial failed to identify what foundation was allegedly lacking. As a result, counsel's objections did not enable the court "'to consider excluding the evidence or limiting its admission to avoid possible prejudice,'" nor did they allow the prosecutor "'to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.'" (*Partida, supra,* 37 Cal.4th at p. 434.)

9

In sum, counsel's objections were neither "*timely* made" nor sufficient "to make *clear* the *specific* ground" for their basis. (Evid. Code, § 353, subd. (a), italics added.) Counsel declined to make pretrial evidentiary objections, *Kelly*-based or otherwise. As a result, Gutierrez's current *Kelly* contentions are forfeited. (*Ochoa, supra,* 19 Cal.4th at p. 414.)

### C.  *The Claims Also Fail on the Merits*

In any event, if we were to consider Gutierrez's new *Kelly*-based attacks on the DNA evidence, we would conclude they are meritless.

#### 1.  *Legal Background*

In *Kelly, supra,* 17 Cal.3d 24, our Supreme Court established a three-step procedure for evaluating a challenge to the admissibility of evidence involving *new* scientific techniques.[5] "[E]vidence obtained through a new scientific technique may be admitted only after its reliability has been established under a three-pronged test. The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community. [Citation.] The second prong requires proof that the witness testifying about the technique and its application is a properly qualified expert on the subject. [Citation.] The third prong requires proof that the person performing the test in the particular case used correct scientific procedures." (*Bolden, supra,* 29 Cal.4th at pp. 544-545.)

---

[5]  The test was adopted from *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013. (*Kelly, supra*, 17 Cal.3d at p. 32.) However, it is now simply referred to as the *Kelly* test, rather than the *Kelly/Frye* test, because *Frye* was superseded by rule 702 of the Federal Rules of Evidence (28 U.S.C). (See *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 586; *Soto, supra,* 21 Cal.4th at p. 515, fn. 3.) "Though the federal *Daubert* standard for admission of scientific evidence differs somewhat from the *Kelly* standard, appellate decisions affirming the admission of scientific evidence under that standard are relevant to the *Kelly* analysis." (*People v. Lund* (2021) 64 Cal.App.5th 1119, 1140, fn. 6 (*Lund*).)

Nevertheless, "proof of a technique's general acceptance in the relevant scientific community [is not] necessary once a published appellate decision ha[s] affirmed a trial court ruling admitting evidence obtained by that scientific technique, 'at least until new evidence is presented reflecting a change in the attitude of the scientific community.' [Citation.]" (*Bolden, supra,* 29 Cal.4th at p. 545.)  Moreover, "*Kelly* 'does not demand that the court decide whether the procedure is reliable as a matter of scientific fact: the court only determines from the professional literature and expert testimony whether or not the new scientific technique is accepted as reliable in the relevant scientific community . . . .'" (*Soto, supra,* 21 Cal.4th at p. 519.)

### 2. *"PCR"*

Gutierrez argues it was error to admit the DNA evidence because Monroe did not specifically identify her testing method as either of the two accepted methodologies, RFLP or PCR.[6]  Although it is true Monroe never explicitly used the term "PCR" in her testimony, the record establishes the Crime Lab which employs her uses PCR-STR technology, and that it was used in this case.

Here, Monroe explained she used amplification processes in the preparation of the samples, indicating the lab employed PCR methodology.  (See *People v. Henderson* (2003) 107 Cal.App.4th 769, 777-779 (*Henderson*) [comparing RFLP and PCR methods].)  Monroe also testified she used a "GlobalFiler" testing kit, which is a PCR-STR type of testing.  (See *State v. Garland* (Minn. 2020) 942 N.W.2d 732, 747

---

[6]     RFLP, as well as three subtypes of PCR—"DQAlpha," which tests one genetic marker; "Polymarker," which tests five genetic markers; and "Short Tandem Repeat" (STR), which tests three or more genetic markers—are well-established and no longer subject to *Kelly*-based challenges.  (See *People v. Hill* (2001) 89 Cal.App.4th 48, 57 ["The RFLP and PCR methodologies, including the PCR subtypes, have acquired general acceptance in the scientific community"]; *Lazarus, supra,* 238 Cal.App.4th at p. 783 ["[T]he PCR–STR method of analyzing DNA has been found to be generally accepted by many, many courts"].)

["the GlobalFiler kit does not involve novel scientific theories or techniques. GlobalFiler uses the same type of analysis—PCR-STR—used by earlier kits"].) DNA testing kits "all use the same basic methodology, specifically, polymerase chain reaction (PCR), which was developed in the 1980's. The methodology examines places on the DNA strand called short tandem repeats (STRs)." (*People v. Cordova* (2015) 62 Cal.4th 104, 125-126 (*Cordova*); see *District Attorney's Office v. Osborne* (2009) 557 U.S. 52, 62 [since "the mid-1980[']s, there have been several major advances in DNA technology, culminating in STR technology"].) The record demonstrates Monroe used the well-established PCR-STR methodology in this case.

### 3. *STRmix Software*

Gutierrez next claims the DNA evidence should not have been admitted because the prosecution failed to establish STRmix has been generally accepted in the scientific community and that it incorporates generally accepted scientific methods in its statistical analysis—*Kelly*'s first prong. We disagree. Monroe testified to both, and that testimony established the relevant foundation.

We review a court's decision to admit or exclude evidence for abuse of discretion. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10 (*Rodriguez*).) To determine whether a scientific technique is generally accepted under the first prong of the *Kelly* test, we may look beyond the trial record and refer to scientific publications or journals and to judicial decisions from other state and federal jurisdictions. (*Venegas, supra*, 18 Cal.4th at pp. 88-89; *Soto, supra*, 21 Cal.4th at pp. 540-541, fn. 31; *People v. Buell* (2017) 16 Cal.App.5th 682, 690-691 [trial court can rely on published cases from other jurisdictions in finding a scientific technique meets *Kelly* standards].) We may also consider opinions not relied on by the trial court. (*Lazarus, supra,* 238 Cal.App.4th at p. 783; cf. *Soto, supra,* 21 Cal.4th at pp. 540-541, fn. 31 [approving appellate court reliance on "the very latest scientific opinions, including those published during the appellate phase of the case"].)

12

Here, the prosecutor asked Monroe, "STRmix does not actually make the interpretation. They give you the data and then you make the interpretation; is that correct?" Monroe responded, "We do the initial interpretation and we're the ones who decide which portion of the mixture we're interpreting. STRmix helps us deconvolute, meaning pull apart, all the parts of that mixture into its separate components. [¶] And then as an analyst and in combination with STRmix we're able then to do the comparison. STRmix is what gives us the likelihood ratio." Thus, the electrophoretic process that first separates the DNA samples and generates the initial genetic profile data is the same under the old system and the new.[7]

On cross-examination, Monroe explained that before STRmix was available, analysts used "mathematical guidelines" that had been "developed in the lab." She further explained the difference between the "old method" and STRmix: "besides the likelihood ratio, it's a different way that we're reporting. In the past we would report how rare is the sample we are observing. It's now how likely is this event over a different event." "[B]ecause it's using mathematics and statistics algorithms, . . . it is able to come up with genotypes that us [*sic*], as interpreters, as far as our guidelines go, didn't have the capability to do." With the old method, "we would manually – we call it manual method – maybe come up with two proposed genotypes for that major contributor[,] [w]here now the software has the capability to give you more options for that major contributor." "[S]o we're telling [the software] the number of contributors, but we, as analysts, tell it what parts of that contributor, contributor one and two, are suitable for interpretation. So that hasn't changed. If I analyze for a major, only looking at the major, I'm not looking at anyone else."

---

[7]     "Electrophoresis, an integral step in DNA typing, has been established as generally accepted in the scientific community." (*People v. Axell* (1991) 235 Cal.App.3d 836, 858, fn. 9 (*Axell*).)

"The basic science behind DNA testing has long been accepted in court. 'It has now been over 20 years [now 30 years] since DNA evidence was first approved by a California appellate court to prove identity in a criminal case.' [Citations.] But DNA testing is continually being improved. '"[T]he scientific methodology, while fundamentally the same, has become more refined and sophisticated." [Citation.] . . . Neither the use of PCR . . . nor STR technology to analyze mixed-source forensic samples is a new scientific technique.'" (*Cordova, supra,* 62 Cal.4th at p. 128, referring to *Axell, supra,* 235 Cal.App.3d 836; see *People v. Hill, supra,* 89 Cal.App.4th at p. 57 [the PCR methodologies, including the STR subtype, have acquired general acceptance in the scientific community].)

"'[O]nce a new scientific technique becomes generally accepted, a *Kelly* prong-one hearing is not necessary to establish whether *each specific methodology* employing the technique is also generally accepted. [Citation.] Rather than quibble over the components of the process or the interpretation of the results, challenges are directed to the weight of the evidence to be determined by the jury and not to its admissibility.'" (*Cordova, supra,* 62 Cal.4th at p. 128, italics added.)

When assessing changes in DNA technologies, "'[w]hat was once considered revolutionary has now become rather mundane . . . ,' and the threshold issue is 'whether the improvement or refinement in DNA methodology qualifies as another breakthrough innovation within the meaning of *Kelly*, or whether the change represents a mere evolution of a generally accepted scientific technique.'" (*Lazarus, supra,* 238 Cal.App.4th at p. 783.) In other words, the "mere tweaking of existing testing methodologies and calculations," does not implicate the concerns embodied by *Kelly*. (*People v. Stevey* (2012) 209 Cal.App.4th 1400, 1419.)

Incorporating STRmix's established algorithms into existing established PCR-STR technology did not create a new scientific technique. (See *People v. Cowan* (2010) 50 Cal.4th 401, 470 [combining two existing techniques does not create a new

14

technique for *Kelly* prong-one purposes].)  And based on Monroe's expert testimony, a trial court could reasonably conclude use of STRmix to help analyze PCR-STR results is only a modified application of accepted scientific principles and practices.  (*Cordova, supra*, 62 Cal.4th at p. 127 [more sophisticated method of DNA testing "is merely another in a series of improved ways to apply long-accepted science, not a new scientific technique in the *Kelly* sense"]; cf. *Lund, supra,* 64 Cal.App.5th at p. 1139 ["Child Protection System" software used to search online for child pornography "is not a technique or process; it is a program that deploys a technique or executes a process"; no need for a *Kelly* hearing to evaluate it].)

Here, Monroe determined the number of DNA contributors, differentiated DNA peaks from artifacts, evaluated the STRmix data in light of the preestablished parameters programmed by the Crime Lab, and ensured the STRmix run was valid based on review of the program's diagnostics, and by performing comparisons to known samples.  (See *People v. Superior Court (Dominguez)* (2018) 28 Cal.App.5th 223, 237.)  In this context, no further evidence was required to establish admissibility of the results of Monroe's STRmix-assisted testing and analyses.

4. *Conclusion*

We review a court's decision to admit or exclude evidence for abuse of discretion.  (*Rodriguez, supra,* 20 Cal.4th at pp. 9-10.)  Although Gutierrez forfeited his claims by failing to make timely and specific *Kelly* objections below, even considering Gutierrez's claims, we conclude the trial court did not err in overruling defense counsel's generic objections to the DNA evidence on the two grounds Gutierrez now raises.  Because no *Kelly* inquiry was required, any supposed error in the court's overruling Gutierrez's foundational objections did not "result[] in a miscarriage of justice."  (Evid., Code, § 353, subd. (b).)  The weight given to the DNA evidence and to Monroe's related testimony was properly left to the jury.  (*Cordova, supra,* 62 Cal.4th at p. 128; cf. *Henderson, supra,* 107 Cal.App.4th at p. 773 ["the added complication of analyzing a

15

multiple source DNA sample did not affect the admissibility of the evidence, but, instead, was a consideration for the jury in weighing the evidence and determining the credibility and accuracy of the DNA test results"].)

II.    *Sentencing Credits*

Lastly, Gutierrez contends the trial court miscalculated his custody credits and he is entitled to an additional 13 days of credits. He claims he was arrested on this matter on May 14, 2020, not May 22, 2020 as the probation officer stated in her report.

Defendants are entitled to credit for the actual number of days spent in presentence custody plus conduct credits, which are calculated at a rate of four days for every two days in actual custody. (§§ 2900.5, subd. (a), 4019, subd. (f); *People v. Yanez* (2019) 42 Cal.App.5th 91, 96.) Nonetheless, "a prisoner is not entitled to credit for presentence confinement unless he shows that the conduct which led to his conviction was the *sole reason* for his loss of liberty during the presentence period." (*People v. Bruner* (1995) 9 Cal.4th 1178, 1191, italics added.) Furthermore, "the burden is on the accused to establish entitlement to presentence custody credit." (*People v. Shabazz* (2003) 107 Cal.App.4th 1255, 1258.)

At trial, Anaheim police officer Kevin Avila testified he arrested Gutierrez on May 14. But in the probation and sentencing report prepared for this case, the probation officer stated Gutierrez was arrested on May 22, 2020, and he was entitled to 246 days of actual custody between that date and his January 22, 2021 sentencing date. Gutierrez's trial counsel agreed with that number. The probation officer referred to Orange County jail records, stating they showed Gutierrez "has been in custody *on this case* since May 22, 2020." (Italics added.) Her report also said Gutierrez "was arrested for a parole violation warrant, but was not questioned regarding [the] assault and vehicle theft." She noted Gutierrez "is presently on parole . . . with a projected discharge date of April 11, 2023," and "it appears he is pending an additional parole violation."

16

Avila arrested Gutierrez on May 14 on a parole violation warrant. The stabbing at issue here occurred sometime during the night and early morning of May 13; Eduardo did not flag down police until 5:00 a.m. that morning. At that point, Eduardo had not yet identified Gutierrez as his assailant—he had only identified Hansen to police—and he had only given police a *description* of Gutierrez; Eduardo identified Gutierrez in the photo lineup on May 19, 2020. The parole violation warrant could therefore not have been based on the assault because Gutierrez was not identified until several days after he had been arrested by Avila.

Although Gutierrez correctly states the complaint in this case was filed on May 22, he fails to add that the complaint request also included a request for an arrest warrant, with a recommended bail amount of one million dollars. The record indicates that the complaint was electronically filed at 8:00 a.m. on May 22. The court's minutes indicate the complaint was filed along with a "Police/Arrest Report," and a "Declaration/Affidavit in Support of Arrest" as a "[w]alk-through" arrest warrant request. The arrest warrant was signed and issued that morning. Later that day Gutierrez appeared for his arraignment. Thus, the record demonstrates Gutierrez was not in custody on this matter until he was brought before the court on May 22. He had been in custody until that moment on the parole violation warrant. His claim for additional credits therefore fails.

17

## DISPOSITION

The judgment is affirmed.


GOETHALS, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.