Filed 6/2/23 (unmodified opn. attached)    **CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANDRE WILLIAM LEPERE,<br><br>    Defendant and Appellant. | G061393<br><br>(Super. Ct. No. 21CF1170)<br><br>ORDER MODIFYING OPINION;<br>NO CHANGE IN JUDGMENT |

This court hereby orders that the opinion filed on May 16, 2023, be modified as follows:

1.      On page 12, first complete paragraph, delete the quote at the end of the paragraph and replace with the following:  "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  (*Id.* at p. 697.)

This modification does not change the judgment.

                                                            SANCHEZ, ACTING P. J.

I CONCUR:


DELANEY, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>      v.<br><br>ANDRE WILLIAM LEPERE,<br><br>   Defendant and Appellant. | G061393<br><br>(Super. Ct. No. 21CF1170)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge.  Affirmed.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Tami Falkenstein Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

\*       \*       \*

In 1980, a 79-year-old woman was raped and murdered in her Anaheim home. Police booked a rape kit into evidence. In 2002, a forensic scientist was able to extract male DNA from the rape kit. In 2021, police identified Andre William Lepere as a person of interest through DNA "Investigative Genealogy." Lepere was living in New Mexico at that time, but there was evidence he had lived in Anaheim in 1980. Police obtained a search warrant and recovered Lepere's DNA from a trash can next to his home. Lepere's DNA was a match with DNA recovered from the 1980 murder victim.

A jury found Lepere guilty of the 1980 murder. The trial court imposed a sentence of life without the possibility of parole (LWOP). On appeal, Lepere claims the police officer's affidavit in support of the search warrant lacked probable cause and the prosecutor misstated the law during the closing argument.

We find the facts about the DNA evidence and the other corroborating facts in the affidavit established probable cause for the search. As far as the closing argument goes, even if we assume the prosecutor misstated the law, we presume the jurors followed the court's instructions. We also find there was overwhelming evidence of Lepere's guilt. Thus, we affirm the judgment.

I

FACTS AND PROCEDURAL BACKGROUND

On February 19, 1980, police were dispatched to an Anaheim apartment where there was a body of 79-year-old woman lying on a bed. There were no signs of forced entry into the apartment. The victim was naked, her legs were spread apart, and there was a pillowcase stuffed in her mouth. The victim had bruises on her body. There were bite marks on the victim's lower chest and thigh. It was later discovered the victim had two broken ribs, tears to her vagina, and she had died from asphyxiation. Police were unable to identify any possible suspects.

2

In 2002, the victim's sexual assault (rape) kit was analyzed by the Orange County Crime Lab. A forensic scientist was able to extract DNA from the victim's vaginal swabs to create a male DNA profile. In subsequent years, there were advances in DNA technology that enabled forensic scientists to further identify more DNA genetic markers from the extracted sperm cells.

In 2020, the cold case investigation was assigned to Anaheim Police Detective Julissa Trapp, who sought assistance from the FBI. The unknown DNA profile was sent to a company that was able to generate a single nucleotide polymorphism (SNP) profile. The digitized genetic data was uploaded to a genealogy website.

In 2021, the FBI notified Trapp that Lepere had been identified as a person of interest. Lepere lived in Alamogordo, New Mexico. An officer in New Mexico completed an affidavit in support of a search warrant of Lepere's home (the affidavit will be covered in detail in the discussion section of this opinion). After a local magistrate signed and issued the warrant, Trapp and other officers executed the search at 3:30 a.m. Police seized beer cans and other items from Lepere's outside trash can. A couple of weeks later, Trapp received a crime lab report linking DNA collected from one of the beer cans to the DNA profile obtained from the 1980 Anaheim murder victim.

Lepere was arrested. Trapp said to him, "I want to talk to you about something that happened in Anaheim in an apartment with an elderly woman." Lepere said, "There was a . . . I was horny back then." Lepere said he had been with a lady in her forties. Trapp asked, "Was there any other older women that you had any relationship with?" Lepere answered, "Not that I know of."

Prior to a jury trial, Lepere filed a motion to suppress the DNA evidence. (Pen. Code, § 1538.5.) The trial court denied the motion.

During the jury trial, the victim's granddaughter testified the victim had divorced in the 1920s. To the best of her knowledge, the victim had never dated or

3

expressed any interest in men thereafter.  A neighbor testified the victim was friendly and often sat outside her apartment and chatted with people who passed by.  The neighbor said he and his daughter called the victim "grandma."  The neighbor said the victim sometimes used a can of soup to prop open her front door.

Lepere testified he was 22 years old in 1980.  Lepere said the victim invited him into her apartment ostensibly to move furniture and they had consensual sex.  Lepere said about a week later, the victim again invited him inside for sex.  Lepere described these as "'wham bam'" encounters.  Lepere said after the second encounter he found out "a day or two later" that the victim had been killed.

The jury found Lepere guilty of murder and found true a special circumstance allegation (a murder during the commission of a rape).  The trial court imposed an LWOP sentence.  Lepere filed an appeal.

## II

## DISCUSSION

Lepere claims the trial court (A) improperly denied his motion to suppress evidence and (B) the prosecutor committed misconduct.  We shall analyze each claim.

*A.  The Motion to Suppress Evidence*

Lepere claims the magistrate erred in issuing the search warrant because the police officer's affidavit lacked probable cause; therefore, Lepere claims the trial court judge should have excluded the DNA evidence from the trial as well as any derivative evidence (fruit of the poisonous tree).  We disagree.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

4

particularly describing the place to be searched, and the persons or things to be seized."
(U.S. Const., 4th Amend.)

"The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing." (*People v. Kraft* (2000) 23 Cal.4th 978, 1040 (*Kraft*).) "The test for probable cause is not reducible to 'precise definition or quantification.'" (*Florida v. Harris* (2013) 568 U.S. 237, 243.) However, our Supreme Court has held the probable cause threshold "'is less than a preponderance of the evidence or even a prima facie case.'" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 370.)

"'The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" (*Kraft*, *supra*, 23 Cal.4th at pp. 1040-1041.) "The magistrate's determination of probable cause is entitled to deferential review." (*Id.* at p. 1041.) The search "warrant can be upset only if the affidavit fails as a matter of law to set forth sufficient competent evidence" supporting the finding of probable cause. (*Skelton v. Superior Court* (1969) 1 Cal.3d 144, 150.)

Under the good faith exception to the exclusionary rule: "'Evidence obtained by police officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate is ordinarily not excluded under the Fourth Amendment, even if a reviewing court ultimately determines the warrant is not supported by probable cause.'" (*People v. French* (2011) 201 Cal.App.4th 1307, 1323.) However, the good faith exception does not apply if the affidavit is "'"""so lacking in indicia of probable cause"""'" that an officer's reliance on the warrant is objectively unreasonable. (*Ibid.*)

5

In this case, the affidavit in support of the nighttime search warrant is typewritten, single spaced, and about five pages long. It is averred to by Agent Eric Marrujo of the New Mexico State Police. In the first part of the affidavit, Marrujo states the address to be searched, provides a description of the home, and states what evidence is to be collected (discarded items in the trash). Marrujo also gives a brief summary of his education and law enforcement experience.

In the probable cause portion of the affidavit, Marrujo states he was assigned to assist Detective Trapp with the 1980 Anaheim homicide investigation. Marrujo then provides a fairly detailed description of the crime scene. Marrujo summarizes the Orange County Crime Lab's DNA investigation, and the FBI's recent involvement through "Investigative Genealogy." The affidavit states: "On October 2, 2020, . . . the unknown DNA profile was sent to DNA Solutions to possibly develop a SNP (single nucleotide polymorphism) to assist with the investigative genealogy. On December 21, 2020, Detective Trapp received a report from DNA Solutions. The report stated DNA Solutions had been able to generate a SNP profile and had also been able to produce a SNP profile that was uploadable to [redacted]. [Redacted] is a free genealogy website that allows you to upload digitized genetic data."

"On January 29, 2021, FBI Agents Steve Wrathall and Nina Vicencia contacted Detective Trapp to inform her that through genealogy, an investigative lead was generated that identified Andre William Lepere (DOB: 4/16/1957) as a person of interest in this case. Detective Trapp conducted numerous computer checks and learned Lepere currently had a listed home address in Alamogordo, New Mexico."

Marrujo notes Lepere had been arrested in 1973, and his address at that time was three apartment complexes away from where the 1980 murder had occurred. Marrujo also notes that Lepere's mother had died in a car accident in 1982, and her address was in the same apartment complex where the victim was killed. The affidavit

6

further avers that although Lepere had been previously arrested a few times (including an arrest for attempted murder), Lepere's DNA had never been entered into the FBI's Combined DNA Index System (CODIS).

Marrujo concludes: "Based on the above information and details, Detective Trapp believes Andre Lepere is a suspect in the murder [of the victim] and a DNA sample needs to be collected from [Lepere] to compare his DNA to the profile from the victim's vaginal swabs."

Here, the genealogical investigation by the Orange County Crime Lab and the FBI established a possible DNA connection between Lepere and the 1980 murder. Further, there was corroborating evidence that Lepere may have been near the victim's apartment in Anaheim, California, at about the time of the 1980 murder. In short, we find there was "a fair probability . . . that a search" of Lepere's outside trash can "would uncover" circumstantial DNA evidence linking Lepere to the commission of the 1980 Anaheim murder.[1] (See *Kraft*, *supra*, 23 Cal.4th at p. 1040.) Thus, we hold that the New Mexico magistrate had a reasonable basis for issuing the search warrant, and the trial court properly denied Lepere's pretrial motion to suppress the DNA evidence.

Lepere admits: "The affidavit thus contains facts to show that (1) a DNA profile was developed from the semen found at the crime scene, (2) appellant or his family members lived in the same area as the decedent at the time her body was found, and (3) appellant's DNA would likely be found in the trash at his current registered address." However, Lepere argues, "the affidavit does not state any facts to show how appellant was identified from the SNP profile as a suspect." We disagree.

Agent Marrujo averred in his affidavit that the FBI had utilized a technique known as "Investigative Genealogy." Marrujo specifically noted how the SNP or

---

[1] There apparently was no dispute that the trash can was within the "curtilage" of Lepere's home, and thus was part of the home itself for Fourth Amendment purposes. (See *Florida v. Jardines* (2012) 569 U.S. 1, 6.)

7

"digitized genetic data" developed from the 1980 murder victim's vaginal swab had been uploaded to a genealogy website, which resulted in the two named FBI agents identifying Lepere as a person of interest. While a more fact-intensive description of "Investigative Genealogy" may have been helpful, the level of detail in the affidavit was adequate. (See *People v. Varghese* (2008) 162 Cal.App.4th 1084, 1103 ["Because they are often written by nonlawyers in the midst of an investigation, technical requirements for elaborate specificity have no place in the review of search warrant affidavits"].)

Lepere further argues: "At most, the affidavit merely recited the investigating officer's opinions and conclusions that appellant was identified as a possible suspect, which are insufficient to support a finding of probable cause." Again, we disagree. In addition to the DNA evidence and other corroborating facts in the affidavit, Marrujo stated, "Detective Trapp believes Andre Lepere is a suspect in the murder . . . , and a DNA sample needs to be collected from [Lepere] to compare his DNA to the DNA profile from the victim's vaginal swabs." We find that the opinion simply reinforced the veracity of the affidavit. (See *People v. Tuadles* (1992) 7 Cal.App.4th 1777, 1784 [opinions of officers with training and experience are valuable in interpreting the circumstances and conduct described by an affidavit].)

In any event, even if we were to find the affidavit was not sufficiently detailed, under the good faith exception to the exclusionary rule, we would not find it necessary to exclude the evidence. There was no suggestion at the hearing on the motion that Agent Marrujo had misrepresented the facts. Indeed, an assistant district attorney signed off as to the "legal sufficiency" of the affidavit. Thus, we would find the officers executing the search objectively relied on the validity of the search warrant in good faith. (See *United States v. Leon* (1984) 468 U.S. 897, 922 [when an officer acts in good faith reliance upon a search warrant, the exclusion of evidence does not serve the purpose of the exclusionary rule: deterrence of police misconduct].)

8

*B. The Prosecutor's Closing Argument*

Lepere claims the prosecutor committed prejudicial misconduct during the closing argument. We disagree.

We evaluate claims of prosecutorial misconduct (or error) under well-established standards. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"'A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the state.'" (*People v. Hill* (1998) 17 Cal.4th 800, 819-820.) However, "'the term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

In reviewing a prosecutor's comments to the jury, "we must view the statements in the context of the argument as a whole." (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.) Generally, a prosecutor has "'wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide.'" (*Ibid.*) The relevant question is "'whether there is a reasonable likelihood that the jury construed or applied any of the complained-of-remarks in an objectionable fashion.'" (*Id.* at pp. 1202-1203.)

Generally, to raise an alleged error on appeal, the issue must first be raised in the trial court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 & fn. 2.) A defendant forfeits

a prosecutorial misconduct claim on appeal unless the defendant objected to the alleged misconduct when it occurred and further asked the court to admonish the jury. (See *People v. Ervine* (2009) 47 Cal.4th 745, 806.)

Here, the prosecutor began the closing argument, in part, by discussing the familiar burden of proof in all criminal cases:

"Proof beyond a reasonable doubt means proof that leaves you with an abiding conviction the charge is true. Now, it's not the same as proof beyond all conceivable doubt, because as the instruction itself explains, everything in life is subject to some possible imaginary doubt.

"Now, is it a high burden of proof? Absolutely. As well it should be. But make no mistake, it's a burden of proof I welcome, it's a burden of proof that's appropriate. It's a burden of proof that, based on the state of the evidence, I have far exceeded. [¶] When you consider the totality of the evidence, not least of which is his testimony, he is the epitome of guilty beyond a reasonable doubt."

In this appeal, Lepere objects only to the following italicized portions of the prosecutor's closing argument:

"*There are two interpretations of the evidence that have been presented to you. One, that he's the perpetrator, and one that he's not.*

"Of course he's the perpetrator. His story is ridiculous. And as ridiculous as it is, I would be remiss if I failed to point out *I don't even got to prove it's absurd or ridiculous. I have to prove that it's unreasonable. And that's because, as you'll hear in the instructions, you are duty bound to reject any interpretation of the evidence that is unreasonable.*

"Sometimes a fact is so obviously damning, that because it's obvious, we begin to take it for granted. There's a tendency to then lose sight of just how significant it is. Don't make that mistake.

10

"This woman was 79-and-a-half years old.  She was born in the year 1900. She swore off men since before the Great Depression.  She wore house dresses, at least since she retired . . . .  People who were not related to her at the complex called her grandma.  She propped her door open with a soup can.

"And beyond that, she was a regular person.  This isn't a movie star, celebrity, supermodel with perfect genes that looks 20, 30 years younger.  This woman looked, and more importantly acted, every bit her age.

"It's not just that when she was found dead, there was semen inside of her. It's that all these years later, the DNA testing confirmed that the semen -- it didn't belong[] to anyone that was even remotely close to her generation, let alone age.  Yet that defendant expects you to believe this woman would have sex with him?  It's silly.  Of course she wouldn't do that.

"He expects you to believe that she would have sex with someone who was 57 years younger than her, ten years younger than her granddaughter.  And to do it the very first time he ever stepped foot in her apartment.  Of course not."  (Italics added.)

Lepere contends his trial testimony was direct evidence and not subject to the jury instruction to reject unreasonable inferences applicable to circumstantial evidence.  (See CALCRIM No. 224 ["when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable"].)  Further, Lepere contends "the prosecutor's argument misstated the burden of proof by suggesting that the burden was met as long as the prosecution proved appellant's testimony was unreasonable."  (See CALCRIM No. 220 ["In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial"].)

Lepere did not object during the prosecutor's closing argument, so this issue has been forfeited for purposes of appeal.  (See *People v. Ervine*, *supra*, 47 Cal.4th

11

at p. 806.)  Lepere argues in the alternative that his trial counsel provided ineffective assistance by failing to object during the closing argument.  We disagree.

To establish an ineffective assistance of counsel claim, a defendant must show:  1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and 2) this resulted in prejudice to the defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-692.)  "A court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed."  (*Id*. at p. 677.)

The standard for analyzing prejudice in an ineffective assistance of counsel claim mirrors the state standard for prejudicial error.  (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050-1051.)  That is, "a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  If the challenged statements of the prosecutor during closing argument do not constitute prejudicial error, then defendant has not established ineffective assistance of counsel based on a failure to object to those challenged portions of the prosecutor's argument.  (See *Strickland*, *supra*, 466 U.S. at p. 697.)

Here, even if we assume that the prosecutor misstated the jury instruction as to circumstantial evidence (CALCRIM No. 224) and/or misstated the standard of proof (CALCRIM No. 220), we do not find it reasonably probable that an objection and/or a curative instruction would have resulted in an outcome more favorable to Lepere.

The judge instructed the jurors they were required to follow the law as explained by the court:  "You must follow the law as I explain it to you, even if you

12

disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.) The court correctly instructed the jurors on the distinction between direct and circumstantial evidence: "Both direct and circumstantial evidence are acceptable types of evidence . . . and neither is necessarily more reliable than the other." (CALCRIM No. 223.) The court also correctly instructed the jurors on the standard of proof: "Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty." (CALCRIM No. 220.)

Given the prosecutor's accurate statement of the burden of proof at the beginning of the closing argument, and the court's correct jury instructions, we find it is not reasonably probable the jurors misapplied the instructions. That is, we do not presume the jurors blindly followed the prosecutor's alleged misstatements of the law, which were purportedly inconsistent with the court's instructions. (See *People v. Mills* (2012) 55 Cal.4th 663, 680.) Indeed, we must presume the jury understood and followed the court's instructions. (See *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1370.)

Moreover, the undisputed DNA evidence and Lepere's testimony provided overwhelming evidence of his guilt. As the prosecutor appropriately argued, Lepere's testimony was "ridiculous." (See *People v. Schultz* (2020) 10 Cal.5th 623, 656-657 [assuming trial court erred, error was not prejudicial where there was DNA evidence linking defendant with sperm recovered during murder/rape victim's autopsy]; see also *People v. Wright* (1998) 62 Cal.App.4th 31, 44 [counsel was not ineffective in failing to call witness where there was overwhelming DNA evidence of defendant's guilt].)

13

III

DISPOSITION

The judgment is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


DELANEY, J.